United States Courts
Southern District of Texas
F I L E D

OCT 0 3 2023

Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ALEXANDER MOSKOVITS,**

      **Plaintiff,**

**vs.**　　　　　　　　　　　　　　**Case No. 23-CV-_____**

**MCGLINCHEY STAFFORD PLLC,
NICHOLAS R. O'CONNER, and
MATT D. MANNING,**

      **Defendants.**

_____/


## VERIFIED COMPLAINT (JURY TRIAL DEMANDED)

*Pro se* Plaintiff Alexander Moskovits ("Plaintiff") hereby respectfully

files his complaint against McGlinchey Stafford PLLC, Matt D. Manning,

and Nicholas R. O'Conner ("attorney-defendants"), averring as follows:


## NATURE OF THE ACTION

1. This is an action for a fraud on the court or for intrinsic fraud, and

for defamation *per se* by attorney-defendants who represented the defendants

in *Alexander Moskovits vs. Mercedes-Benz Financial Services USA LLC,*

*Automotive Recovery Services, d/b/a Adesa, Adesa Texas, Inc., d/b/a Adesa,*

Case No. 21-CV-02260. *See* Exhibit A (Verified Amended Complaint filed

on November 8, 2021 as Document No. 23 in Case No. 21-CV-02260).

1

## JURISDICTION, DAMAGES, AND VENUE

2. This Court has diversity of citizenship jurisdiction over this action seeking total damages exceeding $75,000.00 (seventy five thousand dollars), exclusive of interests and costs, as Plaintiff is not a resident of Texas. *See* 28 U.S.C. § 1332. Plaintiff seeks the treble damages exceeding $75,000.00 (seventy five thousand dollars), exclusive of interests and costs, to which Plaintiff would have been entitled to as a matter of law in a prior lawsuit, but for the alleged fraud on the court and/or intrinsic fraud that was committed by attorney-defendants, plus punitive/exemplary damages.

3. Venue is proper since attorney-defendants committed all of the acts complained of within the Southern District of Texas. *See* 28 U.S.C. § 1391.

## THE PARTIES

4. Alexander Moskovits is an individual, *sui juris*, and a citizen of the United States, now residing in Punta del Este, Uruguay, South America.

5. McGlinchey Stafford is a "professional limited liability company" ("PLLC"). It is a law firm headquartered in New Orleans, Louisiana, which conducted business in Houston, Texas at all relevant times.

6. Nicholas R. O'Conner, Esq., is an "associate" of the PLLC, and a lawyer duly licensed to practice law in the State of Texas, who practiced law in Houston, Texas at all relevant times.

7. Matt D. Manning, Esq., is a "managing member" of the PLLC, and a lawyer duly licensed to practice law in the State of Texas, who practiced law in Houston, Texas at all relevant times.

## FACTUAL ALLEGATIONS

8. Plaintiff bought a new Mercedes-Benz CLA 250 in January 2017 at *Mercedes-Benz of Miami* with a $19,000 down payment (approximately 50% of the sticker price) for a pre-announced road trip to Mexico.

9. Plaintiff drove out of the United States through Laredo, Texas.

10. Due to an incident in Mexico, Plaintiff left the vehicle at an official brand dealer, *Mercedes-Benz EuroDiez*, in VeraCruz, Mexico for repairs.

11. *Mercedes-Benz EuroDiez* held the vehicle for over a year, while Mercedes-Benz Financial Services USA LLC (MBFS) failed to provide towing help to transport the vehicle to the nearest brand dealer in Texas, even at Plaintiff's expense, but he continued making monthly payments to MBFS.

12. In November 2018, Plaintiff decided to stop payments after he had paid Mercedes-Benz over $28,000 for a vehicle driven for only ten (10) days - the $19,000 check down payment plus over $9,000, with more than $5,000 paid while the car was held in Mexico without requested towing assistance.

13. On or about July 16, 2019, the car was reportedly transported from *Mercedes-Benz EuroDiez* in VeraCruz, Mexico to the international border in Laredo, Texas, where U.S. federal agents processed the repatriation of the car into the custody and control of Laredo, Texas police who stored the car.

3

14. The car was taken to Houston, Texas, where it was auctioned on August 22, 2019 by Mercedes-Benz Financial Services USA LLC (MBFS) without judicial process and without pre-sale notice provided to Plaintiff.

15. In the Verified Amended Complaint, Case No. 21-CV-02260, *see* Exhibit A, Plaintiff sought treble damages for the denial of judicial process in violation of Tex.Bus.&Com § 9.609, UCC Cmt. 3 (*"**this Section does not authorize a secured party who repossesses without judicial process to utilize the assistance of a law enforcement officer**"*) (emphasis added), the Seventh Amendment, and the Due Process Clauses of the U.S. Constitution.

16. *__Denial of judicial process after using law enforcement assistance in a repossession is the only assertion pleaded in support of all claims in the prior case that is relevant to this case based on documentary evidence__*. *See* Exhibit A (*citing* § 9.609 UCC Cmt. 3 *__in support of all claims__*); *see also* Tex.Bus. & Comm.Code § 17.50 (treble damages).

17. Defendants in prior Case No. 21-CV-02260 were represented by McGlinchey Stafford PLLC ("PLLC") through Nicholas R. O'Conner, Esq. and Matt D. Manning, Esq.

18. The attorney-defendants have withheld evidence in their actual or constructive possession that MBFS, through its agents, utilized the assistance of law enforcement to process the export-import repossession from Mexico to Texas *__by knowingly making false statements to law enforcement officers in Mexico and Texas that Plaintiff's car had been stolen__*, *see* Exhibit B

4

(Miami federal court filing by counsel for Mercedes-Benz affiliates claiming the car was "***somehow lost by Plaintiff in a robbery in Mexico***") (emphasis added), and thereby deprived Plaintiff of due judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and the Due Process Clauses of the U.S. Constitution.

19. Knowing that the car was not stolen, but instead left by Plaintiff at *Mercedes-Benz EuroDiez,* a Mercedes-Benz dealer in VeraCruz, Mexico, the prior case defendants knowingly made false statements to law enforcement in Mexico and federal and state law enforcement officers in Laredo, Texas by stating that the car was stolen in processing the repossession/repatriation.

20. The attorney-defendants withheld the evidence of said violations of 18 U.S.C. § 1001 and Texas Penal Code § 37.09(a)(1)-(2), and negotiated settlement in bad faith, motivated by an invidious class-based discriminatory animus documented in an email by attorney-defendant O'Conner regarding 36-year old, 1987 drug charges against Plaintiff. *See* Exhibit C.

## RELEVANT PROCEDURAL HISTORY OF CASE NO. 21-CV-02260

21. On November 8, 2021, a *Verified Amended Complaint* was filed after Plaintiff learned that law prohibits repossession without judicial process when law enforcement assistance is utilized, Tex.Bus.&Com § 9.609, UCC Cmt. 3 ("***this Section does not authorize a secured party who repossesses without judicial process to utilize the assistance of a law enforcement officer***") (emphasis added), which law was fully applicable in Laredo, Texas,

*__where the repossession governed by Texas law occurred__*.  Plaintiff's claims were amended to add the denial of judicial process due under Texas law, where law enforcement assistance was used in the repossession, to plead an "unconscionable action or course of action." Exhibit A (*Verified Amended Complaint*) at ¶¶39-42; *id.* at ¶¶33, 35 (*citing* § 9.609, UCC Cmt. 3).

22. The *pro se* pleadings amended that law enforcement assistance was necessarily used to execute the repossession/repatriation, and that *__Texas law only began to apply and was violated at the international border, where Laredo, Texas police took custody of the vehicle and stored it, effectively repossessing without judicial process__*. *Id.* (*Verified Amended Complaint*). All amended claims were based in relevant part on denial of judicial process. *See also* Exhibit A (Verified Amended Complaint) at ¶¶47, 52, 56.

23. On November 12, 2021, Plaintiff moved for summary judgment as to the denial of judicial process due because the repossession had utilized the assistance of law enforcement at the international border and Laredo, Texas, where police took the vehicle into its control and custody and stored it. Plaintiff argued there can be no genuine dispute as to the material fact that law enforcement was utilized in repossessing without judicial process.

24. On December 3, 2021, the attorney-defendants responded that the repossession occurred in Mexico, while law enforcement assistance occurred only hundreds of miles away at the international border, and they also argued that the repossession caused no "breach of the peace."

25. On December 21, 2021, Plaintiff replied that he did ***not*** raise "any arguable breach of the peace" insisting that the repossession governed by Texas and U.S. law occurred at the border and in Laredo, Texas, where it is ***not*** disputed that law enforcement assistance was utilized, including police custody and storage of the vehicle. Plaintiff relied upon his *Verified Amended Complaint*, *see* Exhibit A, as his summary judgment evidence, *following King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

## The Status Conference

26. On January 19, 2022, U.S. Magistrate Judge Dena Palermo held a "status conference" and heard argument on the *pro se* motion for summary judgment asserting a denial of judicial process due because law enforcement assistance was used at the border during the repossession in Laredo, Texas, where police took custody of the car and stored it.

27. Plaintiff argued that "but for the assistance [of law enforcement], there would be no repossession" and that "***denial of judicial process… constitutes per se unconscionability***." *See* Exhibit D (Transcript) at p.8 (emphasis and brackets added). Plaintiff also argued that the prior case defendants had "used… the integral participation of law enforcement at the international border." *Id.* at pp.8-9.

28. "What was their participation?" asked the U.S. Magistrate Judge, and the uncounseled Plaintiff responded:

> *[T]o process the importation of my property into the United States. And defendants do not deny th[at] local law enforcement in Laredo, Texas, as I allege, quote-unquote, stored the vehicle. That is a seizure under the Fourth Amendment….But the holding, the custody of the car by local police in Laredo, Texas also constitutes assistance during this international process. Part of it was governed by Mexican law while it was south of the border, but at the border and beyond it was governed by Texas law and U.S. Constitutional principles. And but for law enforcement assistance, there would have been no repossession. And to do it without judicial process is per se unconscionable. They do not deny … that the car was held in storage[.]*

Exhibit D at p.9 (emphasis and brackets added). Attorney-defendants argued that "the repossession was concise and complete in Mexico, and that the processing of the vehicle at the border and the storage of the vehicle by police in Laredo were after-the-fact." *Id.* at p.12. Attorney-defendants argued that

> *even if the Court were to find that the repossession was continuing and it was during the time that the vehicle was stored by Laredo Police,* a police officer's involvement or law enforcement officer's involvement in doing his job in the context of storing a vehicle, for instance, after it was processed at the border does not constitute a breach of the peace or a violation of due process ….

*Id.* at p.13 (emphasis added).

> 29. *The Court asked why the police was involved in storing the car:*

> … *So it's a little weird to me because this is a very unusual set of circumstances, clearly. Why were the police, if the car was already repossessed and transported across the border, why did the police have to store it? Why didn't you just take it to another Mercedes dealer? What does the police storage in Laredo have to do with anything here?*

*Id.* (emphasis added). Attorney-defendant Manning hedged his answer, as if attorney-defendant O'Conner, who appeared at the status conference as his co-counsel, may have known "that fact":

"Your Honor, I don't know the answer to that yet. Mr. Moskovits is the one who has indicated that it was stored in Laredo. *__We--I don't know__*, I haven't been able to verify that fact yet. But again, as I indicated, even if he's right, it shouldn't matter in the ultimate analysis."

Exhibit D at pp.13-14 (emphasis added).

### The Fraud by Omission of Material Facts

30. Had the Magistrate Judge's questions been truthfully answered by attorney-defendants, it would explain why the vehicle was returned to police in Laredo, Texas, from where Plaintiff drove the car out of the United States, rather than "another Mercedes dealer." *See* Exhibit B (Miami federal court filing by counsel for Mercedes-Benz affiliates claiming car was "*somehow lost by Plaintiff in a robbery in Mexico*") (emphasis added). Attorney-defendants omitted that their clients *__falsely stated to law enforcement__* in Mexico and Laredo, Texas that the repatriated vehicle had been stolen, and thusly, law enforcement assistance had been utilized in repossessing without judicial process, in violation of Tex.Bus.&Com § 9.609, UCC Cmt. 3, the Seventh Amendment, and the Due Process Clauses of the U.S. Constitution.

31. Plaintiff stated, in accord with law, *see* § 9.609, UCC Cmt. 3, that "[e]ven if you are in default, Your Honor, technically, judicial process is required under these circumstances, where but for law enforcement assistance, there would have been no repossession governed by Texas law." Exhibit D at p.17 (brackets added).

## Court-Order and Bad Faith Settlement Negotiations

32. The Judge stated a clear preference for "settlement negotiations":

Mr. Moskovits, you're *pro se*, and if the defendants start hammering you with a bunch of discovery, that's going to take up all of your time. And so I don't want you to have to waste your time and, you know, the defendants have to spend a lot of money. ***But what I would encourage everybody to do in this interim period is to seriously discuss settlement negotiations. …In the interim, I am going to give you that assignment as homework. Instead of going on and doing discovery, work on settlement, and keep working on it until you hear a ruling from me. And hopefully you will tell me that you've settled it so that I don't actually have to rule on the motion. That would be the best outcome to me.***

*Id.* at pp.25-26 (emphasis added).  After hearing arguments, Judge Palermo

issued an Order directing the parties "to engage in settlement negotiations."

33. Plaintiff offered to settle for a refund of all he paid on the car driven

for ten (10) days, *i.e.*, $28,157.94 (twenty eight thousand one hundred and

fifty seven dollars and ninety-four cents). Attorney-defendants negotiated in

bad faith and offered only $5,000 (five thousand dollars), showing a clear

preference for churning fees, given the voluminous filings made thereafter

in Case No. 21-CV-02260 (S.D.Tex.) and in Case No. 22-20522 (presently

pending in the U.S. Court of Appeals for the Fifth Circuit).

## The Continuing Litigation over the Claimed Denial of Judicial Process

34. On July 18, 2022, the Magistrate Judge issued her Report and

Recommendation (R&R) that Plaintiff's action be dismissed with prejudice

and that Plaintiff's motions for summary judgment be denied as moot.

35. On August 15, 2022, Plaintiff filed his Objections to the R&R, maintaining in relevant part that he was entitled to summary judgment as to the deprivation of judicial process where the repossession/repatriation of the car into the custody, control, and storage of Texas law enforcement at the border in Laredo, Texas *required pre-arranged law enforcement assistance on both sides of the border to issue the "permit(s)" for the export-import.* The law enforcement assistance provided at the border and Laredo, Texas was incident to the seizure of the vehicle hours earlier in Mexico.

36. On August 25, 2022, attorney-defendants responded, and Plaintiff replied on August 29, 2022. The court adopted the R&R on August 31, 2022, and the final judgment was filed by the district court on September 25, 2022. On September 28, 2022, Plaintiff moved for reconsideration of the order adopting the R&R and to alter or amend the final judgment.

37. Plaintiff argued in his motion that the court failed to infer that the attorney-defendants' opposition to even limited case dispositive discovery confirms that the assistance of law enforcement was utilized to execute the repossession/repatriation and the right to judicial process had been violated. The requests for production of documents were narrowly tailored to request only the documents memorializing communications between the prior case defendants, or anyone acting on their behalf, including the *Mercedes-Benz Eurodiez* dealer in Mexico, and any local, state or federal law enforcement agent or agency in Mexico, and/or the U.S.

11

38. Plaintiff asked the district court to reconsider and grant his motion

for summary judgment based on the denial of judicial process constituting

"unconscionable" conduct under the Texas Deceptive Trade Practices Act.

39. On October 6, 2022, attorney-defendants responded on behalf of

their clients. The district court denied Plaintiff's motion on January 18, 2023.

On February 17, 2023, Plaintiff filed an amended notice of appeal, and a

contested appeal is pending in the U.S. Court of Appeals for the Fifth Circuit.

40. Had attorney-defendants not omitted that their clients stated that

the car was stolen to law enforcement to process the repossession, Exhibit B

(Miami federal court filing by counsel for Mercedes-Benz affiliates claiming

car "*somehow lost by Plaintiff in a robbery in Mexico*") (emphasis added),

the outcome of Case No. 21-CV-02260 would have been different as to the

claimed deprivation of due judicial process in violation of Tex.Bus.&Com.

§ 9.609, UCC Cmt. 3 ("*this Section does not authorize a secured party who*

*repossesses without judicial process to utilize the assistance of a law*

*enforcement officer*") (emphasis added), the Seventh Amendment, and the

Due Process Clauses of the U.S. Constitution.

## Defamation *Per Se* and Invidious Class-Based Discriminatory Animus

41. On Saturday, March 11, 2023, the attorney-defendant O'Conner

documented the attorney-defendants' invidious class-based discriminatory

animus against Plaintiff in a defamatory e-mail sent to Plaintiff (with copies

to attorney-defendant Manning and McGlinchey staff member Teri Rostron).

Attorney-defendant O'Conner revealed the invidious discriminatory animus

against Plaintiff over 36-year old, 1987 drug charges for activities in which

Plaintiff participated while an undergrad at the University of Pennsylvania

on the Dean's List of the Wharton School of Finance and Commerce.

**RE: Only what Pres. Donald Trump calls the corrupt "administrative state" can uphold this decision**
O'Conner, Nicholas <noconner@mcglinchey.com>
Sat 3/11/2023 7:42 AM To:alexander moskovits
<alexander.moskovits@hotmail.com> Cc:Manning, Matt
<mmanning@mcglinchey.com>;Rostron, Teri
<trostron@mcglinchey.com>
Mr. Moskovits,

We are aware of your time at Penn. It's my understanding that the activities
you participated in and, in fact, facilitated during your time there have a
significant impact on the human brain. Had you elected to study at Penn
instead of consume what I can only presume was copious amounts of the
very drug you peddled, you may still be of sound mind. Unfortunately,
from your emails, it is very clear that you are not well.

I hope that you get the help that you desperately need, but even you
understand that this is a fruitless endeavor. Your claims are frivolous and
your emails are only building up a case that you filed this suit for the
purpose of harassment. Had you actually studied at Penn, you may realize
what everyone else already knows. It's frankly sad at this point that you are
unable or unwilling to come to that obvious realization.

*See* Exhibit C (copy of e-mail published by attorney-defendant O'Conner).

42. The U.S. court record in Case 87-284 (E.D.Pa.) shows that Plaintiff

was on the Dean's List of Penn's Wharton School and that the government

sought a harsher sentence for his involvement with drug distribution since

he did not consume any drugs. And, decades later, Judge Palermo was "very

impressed" with Plaintiff's "outstanding" papers. *See* Exhibit D at pp.18-19.

## FRAUD ON THE COURT
### (Against All Defendants)

43. Plaintiff repeats and re-alleges all of the factual averments set forth above in paragraphs 1 through 42.

44. In answer to the court questioning police storage in Laredo, Texas, Exhibit D at p.13, defendants committed a "fraud on the court" by executing an unconscionable plan or scheme designed to improperly influence the court in its decision by concealing case dispositive evidence establishing that law enforcement assistance was utilized in repossessing the car without judicial process, which fraudulently debases the integrity of judicial process.

45. Defendants represented that they did not know why Laredo, Texas police stored the car during the repossession process, Exhibit D at pp.13-14, although they knew that their clients had falsely stated to law enforcement officers that the car was stolen for the repossession/repatriation. Exhibit B (Miami federal court filing by counsel for Mercedes-Benz affiliates claiming car "*somehow lost by Plaintiff in a robbery in Mexico*") (emphasis added).

46. Defendants caused plaintiff damages as their "fraud on the court" resulted in a judgment against Plaintiff which in equity and good conscience, should not be valid, as Plaintiff was entitled to judgment as a matter of law and treble damages for the unconscionable conduct of depriving Plaintiff due judicial process because law enforcement assisted the repossession based on the false representation that the car had been stolen. Exhibit B, *supra.*

14

## INTRINSIC FRAUD
## (Against All Defendants)

47. Plaintiff repeats and re-alleges all of the factual averments set forth above in paragraphs 1 through 42.

48. Defendants' failure to disclose pertinent facts in the matter before the court, where the wrong is only between the parties, is an intrinsic fraud. The prior case defendants knowingly made false statements to federal and state law enforcement in Laredo, Texas and the defendants herein concealed the violations of 18 U.S.C. § 1001 and Texas Penal Code § 37.09(a)(1)-(2).

49. The omission of facts was material; the answer to court questions feigning ignorance of why Laredo, Texas police stored the vehicle was false; when defendants gave the answer to the court they knew it was false or made the representation recklessly and without knowledge of its truth, Exhibit D at pp.13-14; defendants made the representation with the intent that plaintiff act on it; plaintiff relied on the false representation by limiting his argument to seeking an inference that law enforcement assistance was used based on defendants' objection to providing even limited case dispositive discovery; and the fraud caused the plaintiff damages as it resulted in a final judgment which in equity and good conscience, should not be valid, rather than a final judgment in his favor for treble damages based on the unconscionable denial of judicial process due because law enforcement assisted the repossession given the false representation that the car had been stolen. Exhibit B, *supra.*

15

## DEFAMATION *PER SE*
### (Against All Defendants)

50. Plaintiff repeats and re-alleges all of the factual averments set forth above in paragraphs 1 through 42.

51. Defendant O'Conner published false statements to two members of the PLLC stating that the Plaintiff is not of "sound mind" after presumably consuming copious amounts of the drug that he peddled instead of studying at "Penn." Exhibit C ("Had you elected to study at Penn instead of consume what I can only presume was copious amounts of the very drug you peddled, you may still be of sound mind... Had you actually studied at Penn, you may realize what everyone else already knows.").

52. Neither attorney-defendant Manning nor the PLLC disclaimed the false statement published by defendant O'Conner and thereby ratified it.

53. The U.S. court record in Case 87-284 (E.D.Pa.) shows that Plaintiff was on the Dean's List of Penn's Wharton School and that the government sought a harsher sentence for his involvement with drug distribution since he did not consume any drugs. And, decades later, Judge Palermo was "very impressed" with Plaintiff's "outstanding" papers. *See* Exhibit D at pp.18-19.

54. The false statements published defamed plaintiff with the requisite degree of fault regarding the falsity of the statement (negligence as plaintiff is a private individual), and the statement constitutes ***defamation per se***.

## DEMAND FOR JURY TRIAL

55. Plaintiff respectfully demands a jury trial as to all issues so triable.

## PRAYERS FOR RELIEF

## AS TO COUNT ONE – FRAUD ON THE COURT

56. For a final judgment against all the defendants, and each of them, awarding Plaintiff the sum $84,473.82 (3 x $28,157.94) representing the award of treble damages to which Plaintiff would have been entitled, but for the fraud on the court, plus mental anguish damages and punitive damages for the wanton disregard of Plaintiff's right to judicial process

57. For costs of suit and any other relief the Court deems proper.

## AS TO COUNT TWO – INTRINSIC FRAUD

58. For a final judgment against all the defendants, and each of them, awarding Plaintiff the sum $84,473.82 (3 x $28,157.94) representing the award of treble damages to which Plaintiff would have been entitled, but for the instrisic fraud, plus mental anguish damages and punitive damages for the wanton disregard of Plaintiff's right to judicial process

59. For costs of suit and any other relief the Court deems proper.

## AS TO COUNT THREE – DEFEMATION *PER SE*

60. For a final judgment against all the defendants, and each of them, awarding Plaintiff a sum to be determined by a properly instructed jury, plus mental anguish damages and punitive damages for the wanton disregard of Plaintiff's rights.

61. For costs of suit and any other relief the Court deems proper.

Respectfully submitted,

/s/Alexander Moskovits
Alexander Moskovits
Yoo Punta del Este
Av. Franklin Delano Roosevelt, Apt. 2010
Parada 8, 20100 Punta del Este, Uruguay
Email: alexander.moskovits@hotmail.com

## **VERIFICATION**

Under 28 U.S.C. § 1746, I verify under penalty of perjury pursuant to the laws of the United States of America that all of the foregoing facts are true and correct.

Executed on September 28, 2023

/s/Alexander Moskovits
Alexander Moskovits

**EXHIBIT A**
**VERIFIED AMENDED COMPLAINT IN CASE NO. 21-CV-02260**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ALEXANDER MOSKOVITS,**

      **Plaintiff,**

**vs.**                                                    **Case No. 21-cv-02260**

**MERCEDES-BENZ FINANCIAL SERVICES USA LLC,**

**AUTOMOTIVE RECOVERY SERVICES, INC.,**
**d/b/a "ADESA," ADESA TEXAS, INC., d/b/a "ADESA,"**

**and UNKNOWN STATE AND FEDERAL AGENTS,**

      **Defendants.**

_____/

### VERIFIED AMENDED COMPLAINT (JURY TRIAL DEMANDED)

Plaintiff, Alexander Moskovits ("Plaintiff"), hereby files his Verified Amended Complaint against all of the Defendants, averring as follows in support thereof:

### NATURE OF THE ACTION AGAINST PRIVATE AND PUBLIC ACTORS

1. This is an action for a conspiracy to deprive Plaintiff of due process rights to notice and judicial process under the U.S. Constitution, under the color of state law, *see* 42 U.S.C. § 1983, as the conversion and civil theft of Plaintiff's property, involved private and public actors aiding and abetting the deprivation of rights. Plaintiff's email address and his lawyer's information were known to Defendants who used state and federal law enforcement officers to take possession of the car without judicial process in violation of law, and never sent Plaintiff notice that his car was processed through the border on or about July 16, 2019 by federal law enforcement who received the car from Mexico to be stored by police in Laredo, Texas, nor prior due notice of the auction

1

of the car in Houston, Texas on August 22, 2019. The knowing and intentional denial

of minimal due process notice and "judicial process" where law enforcement was used

to take possession of the car and the collection of charges not chargeable to Plaintiff

are "unconscionable" actions under the *Texas Deceptive Trade Practices Act*, entitling

him to "treble" damages, and also constitute unconscionable means used by a collector

under the *Texas Debt Collection Practices Act. See also Bivens, infra.*

### RECENT JUNE 2021 DISCOVERY OF REPOSSESSION AND AUCTION

2. On June 3, 2021, Plaintiff *discovered for the first time* from a representative

of Mercedes-Benz Financial Services USA LLC that, *on or about July 16, 2019*,

Plaintiff's car was received through the international border to be stored by police in

Laredo, Texas, after its return from Mexico, where the vehicle was held for over a year

(after its repair at Plaintiff's expense in late 2017). *See* Exhibit A (international wire

transfer for $2,500 from NY Law Office of Eliza Stahl to Mercedes-Benz EuroDiez in

Mexico, August 15, 2017, *providing law office address, correct phone number, and*

*Plaintiff's account number with Mercedes-Benz Financial Services USA LLC*).

3. Mercedes-Benz Financial Services USA LLC *caused* state and federal agents

to become involved with the return of the car from Mexico and its storage to expedite

an auction of the car in Houston, Texas on August 22, 2019, without giving Plaintiff,

or his last known lawyer who made payment related to the car, notice of the return of

his car from Mexico to Texas, or prior due notice of the auction.

4. As law enforcement officers were involved with the car seizure without notice

to Plaintiff in violation of his due process rights, he sues the officers as co-conspirators

and/or aiders and abettors in the scheme. *See* 42 U.S.C. § 1983; 18 U.S.C. §§ 2(a)-(b)

2

("aiding and abetting" includes acts *caused* by principal Defendant, such as the alleged

unconscionable actions of using law enforcement officers to take possession of the car

"without judicial process" in flagrant violation of the law, civil theft and conversion of

property after auction sale without proper prior notice to Plaintiff, as the car owner who

repeatedly requested that the Defendant Mercedes-Benz Financial Services USA LLC

provide towing assistance to return his vehicle from Mexico to Texas to no avail).

## JURISDICTION, VENUE, AND DAMAGES

5. This Court has federal question jurisdiction over this action for the deprivation

of rights under 42 U.S.C. § 1983, *see* 28 U.S.C. §§ 1331 and/or 1343, seeking damages

exceeding $75,000 (seventy five thousand dollars), exclusive of interests and costs.

This Court also has diversity of citizenship jurisdiction, *see* 28 U.S.C. § 1332, and/or

supplemental jurisdiction, *see* 28 U.S.C. § 1367(a), as to the claims of conversion, theft,

and claims under the *Deceptive Trade Practices Act* and *Debt Collection Practices Act*

given knowing and intentional unconscionable acts as the producing cause of damage

– the seizure of the car utilizing law enforcement officers "without judicial process,"

and its auction on August 22, 2019 without giving Plaintiff or his lawyer notice. *See*

Tex.Bus. & Comm.Code § 17.50(b)(1) (providing *treble damages*).

6. Venue is proper since the Defendants caused the car to be seized by state and

federal law enforcement in Laredo, Texas, and/or because the auction sale occurred in

Houston, Texas, both Texas cities being located within the Southern District of Texas.

*See* 28 U.S.C. § 1391.

3

## PARTIES

7. Plaintiff **ALEXANDER MOSKOVITS** (Plaintiff) is an individual consumer, *sui juris,* and a dual citizen of the United States and Brazil, now domiciled in Brazil.

8. Defendant **MERCEDES-BENZ FINANCIAL SERVICES USA, LLC** (hereinafter MBFS) is a Foreign Limited Liability Corporation doing business in Houston, Texas at all relevant times. MBFS financed the Plaintiff consumer's purchase of his new vehicle, but also utilized law enforcement officers to repossess the vehicle "without judicial process" in violation of law and auctioned it off without notice to the Plaintiff, which unconscionable acts form the basis of this Complaint.

9. Defendant **AUTOMOTIVE RECOVERY SERVICES, INC., dba ADESA** (Defendant "ADESA") is a Foreign Limited Liability Corporation doing business in Houston, Texas at all relevant times. Defendant ADESA reportedly auctioned the car as the agent of Defendant MBFS without prior notice to the Plaintiff.

9a. Defendant **ADESA TEXAS, INC., dba ADESA** (Defendant "ADESA") is a Texas Corporation doing business in Houston, Texas at all relevant times. Counsel for MBFS claim this Defendant "ADESA" auctioned the car as the agent of MBFS.

10. Defendants **UNKNOWN STATE AND FEDERAL AGENTS** are the law enforcement officers who received the car at the border and stored it in Laredo, Texas, and acted under color of state law in conjunction with Defendants MBFS and ADESA. Their names and capacities, individual, plural, corporate, associate or otherwise, are not currently known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will amend the Complaint upon learning their names and capacities.

4

## CONDITION PRECEDENT – NOTICE REQUIREMENT

11. Exception to the 60-day statutory notice requirement has been taken in the Complaint filed July 13, 2021 because of an arguable accrual date of August 22, 2019, the date of the auction without prior notice to Plaintiff – if not June 3, 2021, when Plaintiff *first discovered* the return of his car from Mexico and its expedited auction. Giving the 60-day notice prior to filing suit was rendered impracticable by arguable expiration of applicable two-year statutes of limitations on August 21, 2021.  *See* Tex.Bus. & Comm.Code § 17.505 (b) ("If the giving of 60 days' written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations…, the notice … is not required, but the tender provided for by Subsection (d), Section 17.506 … may be made within 60 days after service of the suit").  All conditions precedent to allow recovery of treble damages and damages for mental anguish under the *Deceptive Trade Practice Act* have occurred.

## FACTUAL ALLEGATIONS

12. On January 13, 2017, Plaintiff bought a new 2017 Mercedes-Benz CLA250 with a dealer sticker price of approximately $38,000 from "Mercedes Benz of Miami." Plaintiff made a down payment of $19,000 (nineteen thousand dollars) by check. *See* Composite Exhibit B (vehicle purchase documents).

13.  Plaintiff agreed to make monthly payments through automatic bank debits. ***Defendant MBFS was provided Plaintiff's email address for purposes of notification.*** *See* Exhibit C (MBFS's e-mail to Plaintiff's email address confirming that his car payments would be automatically debited from his bank account).

5

14. Plaintiff was involved in an incident with his car in Mexico, which tore off its electrical roof. The "international" insurance policy bought as a prerequisite to drive out of the "Mercedes Benz of Miami" lot for Plaintiff's pre-announced trip to Mexico provided "international" coverage in Canada only. Consequently, Plaintiff paid for the new parts and the body shop repair work needed out of his own pocket.

15. Plaintiff drove to the Mercedes-Benz body shop in Vera Cruz, Mexico, *see* https://www.mercedes-benz-eurodiez.com.mx, where new parts and body repairs were pre-paid. *See* Exhibit A (international wire transfer for $2,500 from NY Law Office of Eliza Stahl, August 15, 2017, ***providing office address, correct phone number, and account number assigned to Plaintiff by Defendant Mercedes-Benz***).

16. Upon inspection of the vehicle, the Mercedes-Benz body shop substantially increased its quoted price for the new parts and body work needed to repair the vehicle. Plaintiff accepted the quote, but only agreed to pay the balance upon timely return of his vehicle to the United States on a flatbed tow truck.

17. After the Mercedes-Benz body shop failed to return the car on promised dates twice, and refused to arrange for the return of the vehicle to Texas by flatbed tow truck, Plaintiff left Mexico anguished by the arbitrary hold on his vehicle. The vehicle was driven by Plaintiff consumer for a total of ***ten (10) days***.

18. Plaintiff contacted MBFS and its counsel seeking assistance in towing the car to the nearest Mercedes-Benz dealer in Texas, approximately 630+ miles from Vera-Cruz, Mexico, since counsel for Mercedes-Benz EuroDiez, advised that it could not assist Plaintiff with towing the car to Texas, not even at Plaintiff's offered expense, while at the same time informing Plaintiff that the car would accrue daily storage fees.

19. Plaintiff stopped paying Defendant MBFS on or about November 27, 2018 after it failed to tow the vehicle for 13 months from late 2017 despite requests made by Plaintiff to MBFS and its counsel to return the car to Texas. Non-party Mercedes-Benz EuroDiez was advised by a rep for MBFS that Plaintiff stopped payments on the car.

20. On June 3, 2021, Plaintiff *discovered for the first time* that his vehicle was returned from Mexico on or about July 16, 2019 for an auction by Defendant ADESA on August 22, 2019 as agent of Defendant MBFS, which course of action occurred without proper prior notice to either Plaintiff or his lawyer. *See* Exhibits A & C (Defendant Mercedes-Benz had Plaintiff's lawyer's correct address and phone number and Plaintiff's email address to notify him of the return of the car and the expedited auction by ADESA in Houston, Texas). The vehicle was auctioned without proper prior notice over $2,497.62 (6 stopped payments) and $6,357 charged for storage and the belated return of the car from Mexico, which amounts charged by Defendant MBFS on or about July 16, 2019 were incidental to the obligation or ___*not*___ "legally chargeable" to the Plaintiff consumer.

21. Plaintiff is out of pocket over $41,000.00 (forty one thousand dollars) up to this date to buy the car ($19,000 plus 22 monthly auto payments of $416.27, debited from Plaintiff's bank account), and the balance to repair the damages car, for travel and lodging associated with the vehicle repairs, plus attorney's fees and costs incurred.

22. Defendants' unconscionable actions have caused significant mental anguish. Both Plaintiff and his wife can provide testimony as to the mental anguish suffered.

## FIRST CAUSE OF ACTION -
## CIVIL ACTION FOR DEPRIVATION OF RIGHTS
### (42 U.S.C. § 1983) (Conspiracy/Aiding & Abetting) (as to all defendants)

23. Plaintiff repeats and re-alleges each of the allegations set forth above.

24. Starting from on or about July 16, 2019 and continuing through on or about September 10, 2019, MBFS, ADESA, and Unknown State and Federal Agents, who acted under color of state law, conspired and/or aided and abetted the deprivation of Plaintiff's rights under the Fourth Amendment to the U.S. Constitution through the warrantless seizure of his car, and of his rights under the Due Process Clauses of the U.S. Constitution, and Texas/UCC law, Tex.Bus.&Com § 9.609 (Secured Party's Right to Take Possession After Default), UCC Comment 3 (2021) ("***this Section does not authorize a secured party who repossesses without judicial process to utilize the assistance of a law enforcement officer.***" ) (emphasis added), as all of the Defendants acted unconscionably in failing to protect his right to "judicial process" and minimal due process notice, and thereby injured his person, property, and federal rights.

25. By conspiring and/or aiding and abetting each other, all Defendants caused the deprivations of Plaintiff's rights under the color of state law. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights. Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, *supra*, the Seventh Amendment, and the Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

### SECOND CAUSE OF ACTION -
### *BIVENS* ACTION FOR DEPRIVATION OF RIGHTS
### (Conspiracy/Aiding & Abetting) (as to UNKNOWN FEDERAL AGENT(S))

26. Plaintiff repeats and re-alleges each of the allegations set forth above.

27. Each and every one of the Unknown Federal Agents breached their duty to not violate Fourth Amendment and Due Process rights under the U.S. Constitution, subjecting Plaintiff to warrantless seizure, repossession "without judicial process," and auction of his car without prior notice, thereby injuring his person, property, and rights.

28. All Defendants engaged in an unconscionable course of action knowingly and intentionally, and displayed their wanton disregard for Plaintiff's federal rights.

29. The federal officer(s) aided and abetted the deprivation of rights committed by Defendant MBFS in failing to provide judicial process or any notice of the seizure of the car utilizing the assistance of state and federal law enforcement and due notice of the auction of the car through ADESA in Houston, Texas on August 22, 2019.

30. By conspiring and/or aiding and abetting each other, all Defendants caused the deprivations of Plaintiff's federal rights. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights. Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

## THIRD  CAUSE OF ACTION – DECEPTIVE TRADE PRACTICES ACT
### (as to all defendants)

31. Plaintiff repeats and re-alleges each of the allegations set forth above.

32. As purchaser of the new vehicle financed by Defendant MBFS and auctioned by Defendant ADESA as the agent of Defendant MBFS, Plaintiff meets the definition of a "consumer," *see* Tex.Bus. & Com.CodeAnn. § 17.45(4), qualified to bring a suit for treble damages and damages for anguish. *See* Tex.Bus. & Com.CodeAnn. § 17.50.

33. The repossession of the vehicle "without judicial process" that used federal law enforcement officers to process the car at the international border and state police to store the car in Laredo, Texas, on or about July 16, 2019, and the auction sale of Plaintiff's car without prior notice constitutes an unconscionable course of action, *see* Tex.Bus. & Com.Code § 17.45(5), to the consumer's detriment that took advantage of his lack of knowledge of the repossession without judicial process in violation of law, *see* § 9.609, UCC Cmt. 3, resulting in an expedited auction, to a grossly unfair degree.

34. Defendants took advantage of Plaintiff's lack of knowledge caused by their knowing and intentional omission of judicial process despite utilizing law enforcement officers at the international border and Laredo, Texas and their knowing and intentional omission of notice to Plaintiff or his lawyer who wired funds for car repairs after first contacting MBFS to verify the Mexican affiliate, and Defendant MBFS was aware of the unconscionability of its actions, as it had Plaintiff's email address and his lawyer's address and phone, *see* Exhibits A & C, to give proper prior notice of the return of his vehicle and expedited auction, and "the resulting unfairness is glaringly noticeable, flagrant, complete, and unmitigated."

10

35. Defendants knowingly and intentionally acted in an unconscionable manner as they knowingly and intentionally violated § 9.609, UCC Cmt. 3, *supra*, and sold the car at expedited auction without proper prior notice to Plaintiff or his lawyer, causing Plaintiff damages and mental anguish. *See* Tex.Bus. & Com.Code § 17.50 (b)(1).

36. On a car with a final $38,000+ price, and used for a total of ten (10) days, Plaintiff paid approximately $28,000 (January 13, 2017 $19,000 down payment check, and 22 payments of $416.27, *see* Exhibit C (e-mail from Defendant MBFS to Plaintiff to confirm automatic monthly payments)), until November 27, 2018, when Plaintiff rationally advised Defendant MBFS that he stopped car payments after MBFS failed to tow his car back to Texas, USA for 13 months, even at his own offered expense.

37. Plaintiff paid MBFS over $5,000 during those 13 months (November 2017-November 2018) that MBFS failed to give requested towing assistance to return the car to Texas, while it was held by the Mercedes-Benz dealer in Vera Cruz, Mexico.

38. Plaintiff's car was auctioned without due judicial process or prior notice over his rational consumer decision to "stop payment" due to the failure of Defendant MBFS to provide towing assistance.  The repossession and auction, without judicial process or notice, generated additional charges of approximately $4,000, and were conducted over $2,497.62, (*i.e.*, six (6) stopped payments), and a storage charge of $6,357 due to the long delay in towing not "legally chargeable" to the consumer.

39. Misappropriating the car without judicial process or proper prior notice of the August 22, 2019 auction by ADESA as the agent of MBFS was an unconscionable action or course of action constituting the producing cause of economic damages and damages for mental anguish. *See* Tex.Bus. & Com. Code §§ 17.50(a), 17.50(a)(3).

40. To assist the Plaintiff consumer, there was no available Mercedes-Benz tow from Mexico to Texas, but to repossess without judicial process in violation of law, and expedite auction without any proper prior notice, there was a Mercedes-Benz tow from Mexico to Texas.

41. Plaintiff has suffered major disruption of his routine and mental anguish due to knowing and intentional unconscionable acts, and all Defendants must be held liable.

42. By conspiring and/or aiding and abetting each other, all Defendants caused the unconscionable course of action. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights. Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

## FOURTH CAUSE OF ACTION - DEBT COLLECTION PRACTICES ACT

43. Plaintiff repeats and re-alleges each of the allegations set forth above.

44. Defendants acted as debt collectors at all times relevant hereto.

45. Defendants used unconscionable means by collecting charges incidental to the obligation or not legally chargeable, *see* Tex.Fin.Code § 392.303(a)(2), such as the amount of $6,357 charged on or about July 16, 2019 for "storage" and other charges associated with holding the car for 13 months caused by Defendant MBFS's failure to return the car from Mexico to Texas at the requests of Plaintiff offfering to pay costs.

46. By repossessing and auctioning the vehicle without judicial process or prior notice, Defendants used unconscionable and/or deceptive means to collect a debt. *See* Tex.Fin.Code § 392.304 (a)(19).

47. Plaintiff has suffered economic damages and mental anguish damages, and all Defendants must be held liable for the damages caused by their unconscionable acts. By conspiring and/or aiding and abetting each other, all Defendants caused the use of unconscionable means to collect debt. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights.  Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

## FIFTH CAUSE OF ACTION - CONVERSION

48. Plaintiff repeats and re-alleges each of the allegations set forth above.

49. Plaintiff owned, had possession of, or was entitled to possession of his car.

50. Plaintiff requested towing assistance to return his car to Texas, but MBFS failed to return the car to Texas at the request of Plaintiff for more than a year.

51. Defendants converted the car as the repossession without judicial process or prior notice of auction to Plaintiff, or his lawyer who wired a $2,500 payment related to the car, Exhibits A & C, constitutes the unauthorized and wrongful assumption and exercise of dominion and control over property, to the exclusion of Plaintiff's rights.

52. Plaintiff has suffered economic damages and mental anguish damages, and all Defendants must be held liable for the damages resulting from the conversion. By conspiring and/or aiding and abetting each other, all Defendants caused the unconscionable conversion. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights. Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

## SIXTH CAUSE OF ACTION - CIVIL THEFT

53. Plaintiff repeats and re-alleges each of the allegations set forth above.

54. Defendants unlawfully acquired or exercised control over the vehicle with the intent to permanently deprive Plaintiff of the vehicle.

55. Defendants unlawfully appropriated the car and brought about a transfer of property title on or about September 10, 2019, as a result of the expedited auction held by Defendant ADESA on August 22, 2019 as the Defendant Mercedes-Benz's agent, without proper prior notice to Plaintiff, or his lawyer who wired $2,500 related to the car on August 15, 2017. *See* Exhibit A (international wire from NY Law Office of Eliza Stahl noting defendant Mercedes-Benz account number for Plaintiff's car).

56. Plaintiff has suffered economic damages and mental anguish damages, and all of the Defendants must be held liable for the damages resulting from the civil theft.

14

By conspiring and/or aiding and abetting each other, all of the Defendants caused the unconscionable course of action. Plaintiff is entitled to recover damages for injury to his person and property, and because of the deprivation of his rights caused by the omissions and actions done in furtherance of the conspiracy to deprive him of fundamental constitutional rights. Plaintiff is entitled to "exemplary damages" to achieve deterrence against the present and any similar future deprivations of rights, implicating seizure in violation of the Fourth Amendment, denial of judicial process in violation of § 9.609, UCC Cmt. 3, the Seventh Amendment, and Due Process Clauses of the U.S. Constitution, as all Defendants show wanton disregard for rights.

## DEMAND FOR JURY TRIAL

57. Plaintiff respectfully demands a jury trial as to all issues so triable.

## PRAYERS FOR RELIEF

## ON THE FIRST CAUSE OF ACTION (42 U.S.C. § 1983)

58. For a judgment against all Defendants, and each of them, awarding damages, and also exemplary damages, exceeding $75,000.00 (seventy five thousand dollars), exclusive of interests and costs.

59. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's federal civil rights claim, *see* 42 U.S.C. 1988; and

60. For such other and further relief as the Court may deem just and proper.

## ON THE SECOND CAUSE OF ACTION (*BIVENS*)

61. For a judgment against the UNKNOWN FEDERAL AGENT(S), and each of them, awarding actual and exemplary damages and damages for mental anguish in an amount to be determined at trial;

15

62. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's *Bivens* claim for deprivation of constitutional rights.

63. For such other and further relief as the Court may deem just and proper.

### ON THE THIRD CAUSE OF ACTION (DTPA)

64. For a judgment against all Defendants, and each of them, awarding treble damages and damages for mental anguish caused by their unconscionable course of action in an amount to be determined at trial;

65. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's claim of Defendants' unconscionable course of action in violation of the *Texas Deceptive Trade Practices Act*; and

66. For such other and further relief as the Court may deem just and proper.

### ON THE FOURTH CAUSE OF ACTION (DCPA)

67. For a judgment against all Defendants, and each of them, awarding damages and exemplary damages for using unconscionable means to collect debt, in an amount to be determined at trial;

68. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's claim of Defendants' use of unconscionable means to collect debt in violation of the *Texas Debt Collection Practices Act*; and

69. For such other and further relief as the Court may deem just and proper.

### ON THE FIFTH CAUSE OF ACTION (CONVERSION)

70. For a judgment against all Defendants, and each of them, awarding damages and exemplary damages for their wanton disregard of Plaintiff's rights in an amount to be determined at trial;

71. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's claim of conversion; and

72. For such other and further relief as the Court may deem just and proper.

### ON THE SIXTH CAUSE OF ACTION (CIVIL THEFT)

73. For a judgment against all Defendants, and each of them, awarding damages plus exemplary damages for their wanton disregard of Plaintiff's rights in an amount to be determined at trial;

74. For reasonable attorney's fees, if any are incurred, and costs incurred in bringing Plaintiff's claim of civil theft; and

75. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____/s/_____

Alexander Moskovits
c/o 1050 Grand Blvd.
Deer Park, New York 11729
Tel.: (55)(48)98465.9211
Email: alexander.moskovits@hotmail.com

### VERIFICATION

Pursuant to 28 U.S.C. §1746, I verify under penalty of perjury under the laws of the United States of America that all of the foregoing facts recited are true and correct.

_____/s/_____

Alexander Moskovits

## EXHIBIT A

(Bank wire of $2,500 from N.Y. Law Office to Mercedes-Benz EuroDiez, https://www.mercedes-benz-eurodiez.com.mx, identifying Mercedes-Benz Financial Services Account Number 5000341539001 for Plaintiff's car).



```
SPECIAL INSTRUCTIONS        FINAL PAYMENT FOR ALEXANDER
                            MOSKOVITS ACC#
                            5000341538001



      SOURCE ACCOUNT:  009982147976 CHECKING
      AMOUNT OF WIRE:       2500.00  USD   BANK FEES:     0.00
   CONTRACT#: AZ8086         43425.00  MXN       RATE:     17.3700000
   DATE OF REQUEST:     08/15/17  CITIBANK REF NUM: 2271888512



                     BANKER: P1181415CALIXTO TENORIO-O



                                            PAGE 2 OF 2

                                            R01 C001
```



BR: 00454      INTERNATIONAL MONEY TRANSFER(FOREIGN CURRENCY)      BUS: 000
08/15/17                  CITIBANK REFERENCE NUMBER    2271888512
SENDER INFORMATION        THE LAW OFFICE OF ELIZA D
                          21 DIXON AVENUE
                          COPIAGUE NY 11726

                          1  6318413088

BENEFICIARY INFORMATION   EURODIEZ, S.A. DE C.V
                          AV. EJERCITO MEXICAN NO.155
                          COLONIA EJIDOR PRIMERO DE MAYO
                          BOCA DEL RIO, VERACRUZ MEXICO

                          ACCOUNT: 0029050604400224398

BENEFICIARY BANK          BANAMEX

                          VERACRUZ
                          MEXICO
                          ACCOUNT:
                          SWIFT      BNMXMXMM
INTERMEDIARY BANK

                                            PAGE 1 OF 2

                                            R01 C001

# **EXHIBIT B**

(Documents related to purchase of new 2017 Mercedes-Benz CLA250
financed by lienholder Mercedes-Benz Financial Services LLC USA)



# 2017 CLA250

**Mercedes-Benz**

PO#: 0771558976

VIN: WDDSJ4EB1HN460621

## Standard Features

### PERFORMANCE/HANDLING
2.0L Inline-4 Turbo Engine
208 Horsepower
258 lb-ft Torque
7G-DCT 7-Speed Automatic Transmission
ECO Start/Stop System
All-Season Tires

### COMFORT/CONVENIENCE
Audio System with Single-Disc CD
Bluetooth® Connectivity
Power Driver Seat with Lumbar Support and Memory
Split-Folding Rear Seats
Rain-Sensing Intermittent Windshield Wipers
KEYLESS-START
Dual-Zone Automatic Climate Control
mbrace® - w/ trial period by Verizon Telematics
(subscription required thereafter)

### SAFETY/SECURITY
New Vehicle 4-Year/50,000 Mile Warranty
24-Hour Roadside Assistance Program
Advanced Airbag Protection System
Anti-Theft Alarm System
Active Brake Assist
ATTENTION ASSIST®
Anti-lock Braking System (ABS)
Electronic Stability Program (ESP®)
Brake Assist System (BAS®)
Adaptive Braking Technology
Rearview Camera

## Suggested Retail Price

### PAINT/UPHOLSTERY & TRIM
696 Night Black
155 Sahara Beige MB-Tex
H06 Black Ash Matte Wood Trim

### OPTIONAL EQUIPMENT AND VALUE
413 Panorama Roof
51R 18" Multi-Spoke Wheels
038 Wheel Locking Bolts
668 Smartphone Integration Package: Apple
Destination and Delivery
**Total Retail Price**

# First Class Wheel and Tire Protection
## Service Contract and Application with Deductible

**Mercedes-Benz Financial Services**

Page 1 of 8

| **1.** | **CUSTOMER INFORMATION** | |
|---|---|---|
| LAST NAME | FIRST NAME | MIDDLE INITIAL |
| STREET ADDRESS | | APT/SUITE |
| CITY | STATE | ZIP CODE |
| PRIMARY PHONE NUMBER | SECONDARY PHONE NUMBER | |
| EMAIL ADDRESS | | |

| **2.** | **COVERED VEHICLE INFORMATION** | |
|---|---|---|
| YEAR | VIN | |
| MANUFACTURER | LIENHOLDER | |
| MODEL | New ___ Used | |

| **3.** | **DEALER INFORMATION** | |
|---|---|---|
| DEALER NUMBER | DEALER NAME | |
| STREET ADDRESS | | |
| CITY | STATE | ZIP CODE |
| PHONE NUMBER | CONTACT NAME | |

| **4.** | **FIRST CLASS WHEEL AND TIRE PROTECTION COVERAGE & TERM** |
|---|---|

| **COVERAGE:** Wheel and Tire Protection | Agreement Purchase Date: |
|---|---|
| **TERM:** _____ months (MAXIMUM TERM IS 60 MONTHS).  IF NO COVERAGE OR TERM IS SELECTED, MAXIMUM COVERAGE/TERM WILL APPLY. | Agreement Retail Price:  $ |

The following models are excluded and not covered under the First Class Wheel and Tire Protection Program:
Aston Martin, Bentley, Ferrari, Lamborghini, Lotus, Maybach, McLaren and Rolls Royce.

I (Customer) whose signature appears below, acknowledge that the information contained above is, to the best of my knowledge, true. I have read the terms and conditions contained herein, including, but not limited to, my responsibility to pay a deductible for any Structural Damage tire and/or wheel claims submitted under this Agreement, and I understand and agree to all of the provisions herein. This Agreement is between the Administrator/Obligor and Customer.

| CUSTOMER'S SIGNATURE | DATE |
|---|---|
| DEALER'S SIGNATURE | DATE |

| | **Nevada Residents Only:** By initialing this box, You acknowledge that this Agreement contains an Arbitration Provision, that you have read and understand the Arbitration Procedure section and affirmatively agree to the terms contained therein. |
|---|---|

**THE PURCHASE OF THE FIRST CLASS WHEEL AND TIRE PROTECTION SERVICE CONTRACT IS NOT A REQUIREMENT FOR THE PURCHASE, LEASE OR FINANCING OF A COVERED VEHICLE. THIS AGREEMENT IS NOT AN INSURANCE CONTRACT.**

**THERE IS A DEDUCTIBLE ASSOCIATED WITH THIS AGREEMENT.**
**SEE IMPORTANT TERMS AND CONDITIONS BEGINNING ON PAGE 2 OF THIS AGREEMENT.**

Administrator/Obligor: Safe-Guard Products International, LLC • Two Concourse Parkway, Suite 500, Atlanta, Georgia 30328 • 866-406-1315
In Florida the Obligor and Administrator is Safe-Guard Warranty Corporation, Florida License Number 60126 • Two Concourse Parkway, Suite 500, Atlanta, Georgia 30328, 866-270-5263

MBFSA
12X 9B432          White: DEALER      Yellow: LIENHOLDER      Pink: ADMINISTRATOR      Goldenrod: CUSTOMER          Rev 6/15

FORM# 2340M DEALR 128124 STORE# 370 STR# N:460621.CU-M: 9:22-A

# AGREEMENT TO PROVIDE INSURANCE

Customer Name(s): ALXANDER MOSKOVITS        Date: 01/13/2017

Street Address: 5095 COLLINS AVE

Home Telephone: (305)600-5953     Work Telephone: (305)600-5953

Driver's License #: _____    Issuing State: FL    Expiration Date: _____

| Vehicle: 2017 | MERCEDES-BEN | CLA-CLASS | WDD3J4EB1HN460621 |
|---|---|---|---|
| Year | Make | Model | Vehicle Identification Number (VIN) |

I understand that the Retail Installment Sales Contract or Lease Contract ("Finance Contract") that I signed in connection with my purchase/lease of the above-described vehicle requires me to provide and maintain insurance on the vehicle against the risks of loss or damage. I understand that this insurance must be in an amount equal to the lesser of the unpaid amount due under the Finance Contract or the value of the vehicle and must be maintained for the entire term of the Finance Contract or such other amount as may be required by the finance company. I also understand that the holder of the Finance Contract must be named as the loss payee and that the failure to maintain said insurance coverage may be an event of a default under the Finance Contract. In the event of a default, the holder of the Finance Contract may pursue all of the remedies provided by law and in the Finance Contract as it deems appropriate. Having been advised that I may obtain insurance coverage from a company and agent of my choice, I have selected:

Insurance Company: _____    Policy #: _____

Agent's Name: _____    Telephone: _____

Address: _____

Insurance Coverage: ☐ Collision $ N/A _____ Deductible ☐ Comprehensive $ N/A _____ Deductible

Policy Effective From: _____ To: _____    Named Loss Payee: Mercedes-Benz FinServUSALLC
                                    PO BOX 997542
           Address: SACRAMENTO CA 95899-7542

By signing below, I acknowledge that I have read this Insurance Coverage Acknowledgement and understand my obligation to maintain insurance coverage on the above-described vehicle. I further acknowledge and agree that I have given the Dealership permission to contact my Insurance Company to verify that I have obtained insurance coverage for the vehicle.

_____ 01/13/2017           _____ 01/13/2017
Purchaser Signature     Date       Authorized Dealership Representative     Date

_____ 01/13/2017
Co-Purchaser Signature     Date

SR-ANNL-ATPI (Rev. 07/14)                             TO REORDER CALL 800-282-9691 #7843022

# RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE
## (WITH ARBITRATION PROVISION)

Dealer Number _____   Contract Number _____

| Buyer Name and Address | Co-Buyer Name and Address | Seller-Creditor (Name and Address) |
|---|---|---|
| | | |
| Buyer's Birth Month: | Co-Buyer's Birth Month: | |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller-Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis at the Base Rate of _____ % per year. The Truth-In-Lending Disclosures below are part of this contract. You have thoroughly inspected, accepted, and approved the vehicle in all respects.

| New/Used/Demo | Year | Make and Model | Weight (lbs.) | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| | | | | | Personal, family, or household unless otherwise indicated below<br>☐ business<br>☐ agricultural   ☐ _____ |

You agree that we advised you whether, based on seller's knowledge, the vehicle was titled, registered, or used as a taxicab, police vehicle, short term rental or is a vehicle that is rebuilt or assembled from parts, a kit car, a replica, a flood vehicle, or a manufacturer buy back.

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled | Total Sale Price<br>The total cost of your purchase on credit, including your down payment of $_____ |
|---|---|---|---|---|
| ___% | $ | $ | $ | $ |

(e) means an estimate

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | | Monthly beginning |
| | | |

Or As Follows:

Late Charge. If payment is not received in full within __10__ days after it is due, you will pay a late charge of __5__ % of each installment.

Prepayment. If you pay off all your debt early, you may have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, prepayment penalties, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1  Cash Price (including $_____ sales tax) | $_____ | (1) |
| 2  Total Downpayment = | | |
|     Gross Trade-In Allowance | $_____ | |
|     Less Pay Off Made By Seller (e) | $_____ | |
|     Equals Net Trade In | $_____ | |
|     + Cash | $_____ | |
|     + Other | $_____ | |
|     (If total downpayment is negative, enter "0" and see 4J below) | $_____ | (2) |
| 3  Unpaid Balance of Cash Price (1 minus 2) | $_____ | (3) |
| 4  Other Charges Including Amounts Paid to Others on Your Behalf<br>(Seller may keep part of these amounts): | | |
|   A  Cost of Optional Credit Insurance Paid to Insurance Company or Companies | | |
|     Life | $_____ | |
|     Disability | $_____ | |
|   B  Vendor's Single Interest Insurance Paid to Insurance Company | $_____ | |
|   C  Other Optional Insurance Paid to Insurance Company or Companies | $_____ | |
|   D  Optional Gap Contract | $_____ | |
|   E  Official Fees Paid to Government Agencies | $_____ | |
|   F  Government Documentary Stamp Taxes | $_____ | |
|   G  Government Taxes Not Included in Cash | $_____ | |

**Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below. Your choice of insurance providers will not affect our decision to sell you the vehicle or extend credit to you.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:
**Optional Credit Insurance**

☐ Credit Life    ☐ Buyer    ☐ Co-Buyer   ☐ Both
Term _____

☐ Credit Disability    ☐ Buyer    ☐ Co-Buyer   ☐ Both
Term _____

Premium
  Credit Life $_____
  Credit Disability $_____

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not to buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments.

If the box above is checked to indicate that you want credit life insurance, please read and sign the following acknowledgments:
1  I understand that you have the option of assigning any other policy or policies you own or may procure for the purpose of covering this extension of credit and that the policy need not be purchased from us in order to obtain the extension of credit

X_____
  Buyer                Date

X_____
  Co-Buyer         Date

2  You understand that the credit life coverage may be deferred if, at the time of application you are unable to engage in employment or unable to perform normal activities of a person of like age and sex (You need not sign this acknowledgement if the proposed credit life insurance policy does not contain this restriction)

X_____
  Buyer                Date

X_____
  Co-Buyer         Date

3  You understand that the benefits under the policy will ter

Late Charge. If payment is not received in full within __10__ days after it is due, you will pay a late charge of __5__ % of each installment.

Prepayment. If you pay off all your debt early, you may have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information: See this contract for more information including information about nonpayment, default, prepayment penalties, any required repayment in full before the scheduled date and security interest.

**ITEMIZATION OF AMOUNT FINANCED**

| | | |
|---|---|---|
| 1 Cash Price (including $ _____ sales tax) | | $ _____ (1) |
| 2 Total Downpayment = | | |
| Gross Trade-In Allowance | $ _____ | |
| Less Pay Off Made by Seller (e) | $ _____ | |
| Equals Net Trade In | $ _____ | |
| + Cash | $ _____ | |
| + Other _____ | $ _____ | |
| (If total downpayment is negative, enter "0" and see 4J below) | | $ _____ (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | | $ _____ (3) |
| 4 Other Charges including Amounts Paid to Others on Your Behalf | | |
| (Seller may keep part of these amounts): | | |
| A Cost of Optional Credit Insurance Paid to Insurance | | |
| Company or Companies: | | |
| Life $ _____ | $ _____ | |
| Disability $ _____ | $ _____ | |
| B Vendor's Single Interest Insurance Paid to Insurance Company | $ _____ | |
| C Other Optional Insurance Paid to Insurance Company or Companies | $ _____ | |
| D Optional Gap Contract | $ _____ | |
| E Official Fees Paid to Government Agencies | $ _____ | |
| F Government Documentary Stamp Taxes | $ _____ | |
| G Government Taxes Not Included in Cash Price | $ _____ | |
| H Government License and/or Registration Fees | $ _____ | |
| I Government Certificate of Title Fees | $ _____ | |
| J Other Charges (Seller must identify who is paid and | | |
| describe purpose) | | |
| to _____ for Prior Credit or Lease Balance (e) | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| to _____ for _____ | $ _____ | |
| Total Other Charges and Amounts Paid to Others on Your Behalf | | $ _____ (4) |
| 5 Loan Processing Fee Paid to Seller (Prepaid Finance Charge) | | $ _____ (5) |
| 6 Amount Financed (3 plus 4) | | $ _____ (6) |

OPTION: ☐ You pay no finance charge if the Amount Financed, item 6, is paid in full on or before
_____ Year _____ . SELLER'S INITIALS _____

**OPTIONAL GAP CONTRACT:** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos.                              Name of Gap Contract _____

I want to buy a gap contract.

Buyer Signs X _____

**VENDOR'S SINGLE INTEREST INSURANCE (VSI Insurance):** If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI Insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI Insurance is obtained. If you elect to purchase VSI Insurance through the Creditor, the cost of this insurance is $ _____ and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

You authorize us to purchase Vendor's or Lender's Single Interest Insurance.

Buyer Signs X _____    Co-Buyer Signs X _____    Date: _____

| Trade-In Vehicle | Trade-In Vehicle |
|---|---|
| | |

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy, or not to buy, credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay if you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments.

If the box above is checked to indicate that you want credit life insurance, please read and sign the following acknowledgments:

1. You understand that you have the option of assigning any other policy or policies you own or may procure for the purpose of covering this extension of credit and that the policy need not be purchased from us in order to obtain the extension of credit.

X _____    _____
Buyer    Date

X _____    _____
Co-Buyer    Date

2. You understand that the credit life coverage may be deferred if, at the time of application, you are unable to engage in employment or unable to perform normal activities of a person of like age and sex. [You need not sign this acknowledgement if the proposed credit life insurance policy does not contain this restriction.]

X _____    _____
Buyer    Date

X _____    _____
Co-Buyer    Date

3. You understand that the benefits under the policy will terminate when you reach a certain age and affirm that your age is accurately represented on the application or policy.

X _____    _____
Buyer    Date

X _____    _____
Co-Buyer    Date

**Other Optional Insurance**

☐ _____
Type of Insurance    Term
Premium $ _____
Ins. Co. Name & Address _____

☐ _____
Type of Insurance    Term
Premium $ _____
Ins. Co. Name & Address _____

☐ _____
Type of Insurance    Term
Premium $ _____
Ins. Co. Name & Address _____

☐ _____
Type of Insurance    Term
Premium $ _____
Ins. Co. Name & Address _____

☐ _____
Type of Insurance    Term
Premium $ _____
Ins. Co. Name & Address _____

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____    _____
Buyer Signature    Date

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle from loss or theft. VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI insurance is obtained. If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ _____ and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

You authorize us to purchase Vendor's or Lender's Single Interest Insurance

Buyer Signs X _____   Co-Buyer Signs X _____   Date _____

| Trade-In Vehicle | Trade-In Vehicle |
|---|---|
| Year _____ Make _____ | Year _____ Make _____ |
| Model _____ | Model _____ |
| VIN _____ | VIN _____ |
| Gross Trade-In Allowance $ _____ | Gross Trade-In Allowance $ _____ |
| Payoff Made by Seller $ _____ | Payoff Made by Seller $ _____ |
| Lienholder _____ | Lienholder _____ |

You assign to Seller all of your rights, title and interest in such trade-in vehicle(s). Except as expressly stated to Seller in writing, you represent that your trade-in vehicle(s) has not been involved in an accident, has not had any major body damage or required any major engine repair, and was not previously used as a taxicab, police vehicle, short term rental or is a vehicle that is rebuilt or assembled from parts, a kit car, a replica, a flood vehicle, or a manufacturer buy back.

Buyer Initials _____   Co-Buyer Initials _____

Trade-In Payoff Agreement: Seller relied on information from you and or the lienholder or lessor of your trade-in vehicle to arrive at the trade-in payoff amount shown above and in Item 2 of the Itemization of Amount Financed as the Pay Off Made by Seller. You understand that this amount quoted is an estimate. Seller agrees to pay the payoff amount shown above and in Item 2 in the "lienholder or lessor of the trade-in vehicle, as is set given. If the actual payoff amount is more than the amount shown above and in Item 2 you must pay the 5% or the excess or difference. If the actual payoff amount is less than the amount shown above and in Item 2 Seller will try to pay any overage. Seller receives from your prior creditor or lessor. Except as stated in the "NOTICE on the back of this contract, any assignee of this contract is not be obligated to pay the Pay Off Made by Seller shown above and in Item 2 of any refund

Buyer Signature X _____   Co-Buyer Signature X _____

Agreement to Arbitrate: By signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____   Co-Buyer Signs X _____

SELLER'S RIGHT TO CANCEL - If Buyer and Co-buyer sign here, the provisions of the Seller's Right to Cancel section on the back, which gives the Seller the right to cancel if Seller is unable to assign this contract within _____ days, will apply. If you fail to return the vehicle within 48 hours after receipt of the notice of cancellation, you agree to pay Seller a charge of $ _____ per day from the date of cancellation until the vehicle is returned or repossessed.

X _____
Buyer Signs                                                                    Co-Buyer Signs

## NO COOLING OFF PERIOD

State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.        Buyer Signs X _____   Co-Buyer Signs X _____

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

See back for other important agreements.

NOTICE TO THE BUYER: a) Do not sign this contract before you read it or if it contains any blank spaces. b) You are entitled to an exact copy of the contract you sign. Keep it to protect your legal rights.

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below. You confirm that you received a completely filled-in copy when you signed it.

Buyer Signs X _____   Date _____   Co-Buyer Signs X _____

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____

Seller Signs _____   Date _____   By X _____

Seller _____ assigns its interest in this contract to _____ (Assignee) under the terms of _____

☐ Assigned with recourse        ☐ Assigned without recourse        (Assignee) under the terms

LAW  FORM NO. 553-FL-ARB _____   By _____   Title _____

## OTHER IMPORTANT AGREEMENTS

### 1. FINANCE CHARGE AND PAYMENTS

a. **How we will figure Finance Charge.** We will treat any Prepaid Finance Charge as fully earned on the date of this contract. We will figure the rest of the finance charge on a daily basis at the Base Rate on the unpaid part of your Principal Balance. Your Principal Balance is the sum of the Amount Financed and the Prepaid Finance Charge, if any.

b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of your Principal Balance and to other amounts you owe under this contract in any order we choose.

c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. **You may prepay.** You may prepay all or part of your Principal Balance at any time. If the contract is paid in full within six months after the date you sign it, we may impose an acquisition charge, not exceeding $75, for services performed on your behalf for processing this contract. If you prepay, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

e. **You may ask for a payment extension.** You may ask us for a deferral of the scheduled due date of all or any part of a payment (extension). If we agree to your request, we may charge you a $15 extension fee. You must maintain the physical damage insurance required by this contract (see below) during any extension. If you do not have this insurance, we may buy it and charge you for it as this contract says. You may extend the term of any optional insurance you bought with this contract to cover the extension if the insurance company or your insurance contract permits it, and you pay the charge for extending this insurance.

If you get a payment extension, you will pay additional finance charges at the Base Rate on the amount extended during the extension. You will also pay any additional insurance charges resulting from the extension, and the $15 extension fee if we charge you this fee.

### 2. YOUR OTHER PROMISES TO US

a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under the contract even if the vehicle is damaged, destroyed, or missing.

b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

You give us a security interest in:
• The vehicle and all parts or goods put on it;
• All money or goods received (proceeds) for the vehicle;
• All insurance, maintenance, service or other contracts we finance for you. This includes any funds or money we finance for you.

**All proceeds from insurance, maintenance, service or other contracts we finance for you.** This includes any funds or money

If you pay late, we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
• You do not pay any payment on time;
• You give false, incomplete, or misleading information on a credit application;
• You start a proceeding in bankruptcy or one is started against you or your property; or
• You break any agreements in this contract.

The amount you will owe will be the unpaid part of your Principal Balance plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** If we hire an attorney to collect what you owe, you will pay the attorney's fee and court costs as the law allows. This includes any attorney's fees we incur as a result of any bankruptcy proceeding brought by or against you under federal law.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

f. We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. **What we may do about optional insurance, maintenance service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may cancel benefits under these contracts and use these contracts to reduce what you owe or to obtain refunds of unearned charges to reduce what you owe or to repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

### 3. WARRANTIES SELLER DISCLAIMS

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

If the Seller has sold you a certified used vehicle, this warranty disclaimer does not apply to any warranty covering the vehicle. If any warranty form for this vehicle is part of this contract, the terms on the window form overrides any contrary provisions in this contract.

**2.   YOUR OTHER PROMISES TO US**

**a.**   If the vehicle is damaged, destroyed, or missing. You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

**b.**   Using the vehicle. You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

You give us a security interest in:
   The vehicle and all parts or goods put on it.
   All money or goods received (proceeds) for the vehicle;
   All insurance, maintenance, service, or other contracts we finance for you.
   All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

**c.**   Insurance you must have on the vehicle.

You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium of the insurance and a finance charge at the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e.**   What happens to returned insurance, maintenance, service, or other contract charges. If we obtain a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

**3.   IF YOU BREAK YOUR OTHER PROMISES**

You may owe late charges. You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

we damaged that you may attract once at once, or we repossess the vehicle, we may claim benefits under these contracts, and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**4.   WARRANTIES SELLER DISCLAIMS**

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

**5.   Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

**6.   OPTIONAL SERVICE CONTRACTS**

You are not required to buy a service contract to obtain credit. Your choice of service contract providers for any service contracts you buy will not affect our decision to sell or extend credit to you.

**7.   REJECTION OR REVOCATION**

If you are permitted under Florida's Uniform Commercial Code to reject or revoke acceptance of the vehicle and you claim a security interest in the vehicle because of this, you must either (a) post a bond in the amount of the disputed balance; or (b) deposit all the amount payments as they become due into the registry of a court of competent jurisdiction.

**8.   SERVICING AND COLLECTION CONTACTS**

You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

**9.   APPLICABLE LAW**

Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

**Seller's Right to Cancel**

**a.**   Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit, locate financing for you on the exact terms shown on the front of this contract, and assign this contract to a financial institution. You agree that Seller has the number of days stated on the front of this contract to assign this contract. You agree that if Seller is unable to assign this contract within this time period to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel this contract. Seller's right to cancel this contract ends upon assignment of this contract.

**b.**   If Seller elects to cancel per Paragraph a above, Seller will give you written notice (or in some other manner in which actual notice is given to you). In that event, you may have the option of negotiating and signing a new contract with different financing terms (for example, a larger down payment, a higher annual percentage rate, a required cosigner, etc.) or you may get alternate funds arranged by you.

**c.**   Upon receipt of the notice of cancellation, you must return the vehicle to Seller within 48 hours in the same condition as when sold other than reasonable wear for the time you had it. Except as described below, Seller must give you back all consideration Seller has received from you in connection with this contract.

**d.**   If you do not return the vehicle within 48 hours after receipt of the notice of cancellation, you agree that Seller may take any lawful means to take it back (including repossession if done peaceably) and you will pay for Seller's expenses, including reasonable attorney's fees, if you fail to return the vehicle. You agree to pay Seller the charges allowed under Florida's Retail Installment Sales Act. Regardless of this Seller's Right to Cancel provision, on each day you do not return the vehicle after receipt of the notice of cancellation.

**e.**   While the vehicle is in your possession, all terms of this contract, including those relating to use of the vehicle and insurance for the vehicle, are in full force and you assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage.

we may subtract the refund from what you owe.

**KEEP YOUR OTHER PROMISES**
You may owe late charges. You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

**9.   APPLICABLE LAW**
Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

**Seller's Right to Cancel**

a.   Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit, locate financing for you on the exact terms shown on the front of this contract, and assign this contract to a financial institution. You agree that Seller has the number of days stated on the front of this contract to assign this contract. You agree that if Seller is unable to assign this contract within this time period to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller. Seller may cancel this contract. Seller's right to cancel this contract ends upon assignment of this contract.

b.   If Seller elects to cancel per Paragraph a above, Seller will give you written notice (or in any other manner in which actual notice is given to you). In that event, you may have the option of negotiating and signing a new contract with different financing terms (for example, a larger down payment, a higher annual percentage rate, a required cosigner, etc.) or you may pay with alternate funds arranged by you.

c.   Upon receipt of the notice of cancellation, you must return the vehicle to Seller within 48 hours in the same condition as when sold other than reasonable wear for the time you had it. Except as described below, Seller must give you back all consideration Seller has received from you in connection with this contract.

d.   If you do not return the vehicle within 48 hours after receipt of the notice of cancellation, you agree that Seller may use any lawful means to take it back (including repossession if done peacefully) and you will be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees. If you fail to return the vehicle within 48 hours after receipt of the notice of cancellation you agree to pay Seller the charge shown in the Seller's Right to Cancel provision on the front of this contract for each day you do not return the vehicle after receipt of the notice of cancellation.

e.   While the vehicle is in your possession, all terms of this contract, including those relating to use of the vehicle and insurance for the vehicle, are in full force and you assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage done to the vehicle while the vehicle is in your possession. Seller may deduct from any consideration due to you under paragraph c. above Seller's reasonable costs to repair the vehicle and any daily charges you incur if you fail to return the vehicle within 48 hours after receipt of the notice of cancellation. If the vehicle is not returned, all terms of this Seller's Right to Cancel provision (including those on the front of this contract) remain in effect and you no longer have possession of the vehicle.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family or household use. In all other cases Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

**ARBITRATION PROVISION**
**PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS**

1.   EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2.   IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3.   DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

[The remainder of the Arbitration Provision text is too faded to transcribe reliably.]

## **EXHIBIT C**

(Email from Mercedes-Benz Financial Services LLC USA to Plaintiff's
email address confirming Plaintiff's authorization for automatic monthly
bank debit payments for Account # 5000341539001 re: Plaintiff's car)


GO

---

## Fw: Mercedes-Benz Financial Services Auto Pay Enrollment - 5000341539001
1 mensagem

---

**alexander moskovits** <alexander.moskovits@hotmail.com>                          sex, 4 de jun de 2021 às 02:29
Para: alexander.moskovits@gmail.com <alexander.moskovits@gmail.com>

---

**From:** Alexander Moskovits <alex@defensewriting.com>
**Sent:** Saturday, February 2, 2019 7:43 PM
**To:** alexander.moskovits@hotmail.com <alexander.moskovits@hotmail.com>
**Subject:** Fwd: Mercedes-Benz Financial Services Auto Pay Enrollment - 5000341539001


———— Forwarded message ————
From: <mbfws@daimler.com>
Date: Tue, Feb 21, 2017 at 2:23 PM
Subject: Mercedes-Benz Financial Services Auto Pay Enrollment - 5000341539001
To: <alex@defensewriting.com>


ALEXANDER MOSKOVITS

Thank you for enrolling in the Mercedes-Benz Financial Services Auto Pay program.

This email serves as a confirmation of the information you provided online. The details are as follows:

Mercedes-Benz Financial Services Account Number : 5000341539001 Owner/Lessee Name(s): ALEXANDER
MOSKOVITS
Account Type (Checking/Savings): Checking
Routing Number (9 Digits) : xxxxx7513
Checking/Savings Account Number : xxxxxxxxx1577
Name(s) on Checking/Savings Account : Alexander Moskovit
Requested Start Date : 02/27/17

If you have any questions regarding your account, please contact our Client Care Center at 800.654.6222. Our
knowledgeable representatives are available weekdays from 9 a.m. - 9 p.m. ET, and Saturdays from 9 a.m. - 6 p.m. ET.

The following is a copy of your Auto Pay authorization:

Effective with the regularly scheduled payment following the date of acceptance of this authorization by Mercedes-
Benz Financial Services USA LLC or its successors and assigns (MBFS), I (hereafter "I", "me" or "my") hereby authorize
MBFS to initiate reoccurring electronic debit entries or effect reoccurring charges by any other commercially accepted
means from the account number and financial institution I list where indicated for an amount up to or exceeding by
$100 the regularly scheduled payment in my lease or retail installment contract (Agreement) held by MBFS, DCFS
Trust or Daimler Trust; and further direct the financial institution to honor such debit entries from such account
number. I represent that in the event the account is not under my sole ownership that I am authorized to initiate debit
entries from it. I may cancel this authorization by (a) sending a written cancellation request by regular mail to MBFS
Client Care Center - Auto Pay Department, P.O. Box 685, Roanoke, TX 76262, or by overnight mail to MBFS Client Care
Center - Auto Pay Department, 13650 Heritage Parkway, Fort Worth, TX 76177, (b) sending an email requesting
cancellation addressed to autopaycancel@daimler.com, (c) facsimile to 800.283.9632, (d) cancellation at MBFS.com
as provided in this website, or (e) verbal cancellation at 800.654.6222. This authorization will remain in force until I
cancel it by a method listed herein, MBFS cancels it in writing, or all Agreement obligations are satisfied. If payment is
due on a bank holiday or a weekend, it will be deducted on the next business day. Lease payments will be deducted on
the scheduled due date until the last scheduled lease payment due date. Retail installment contract payments will be
deducted on the scheduled due date until the next to last payment due date; I will receive an invoice for the last
payment.

**EXHIBIT B**
**ECF DOC. NO. 25 IN CASE NO. 21-CV-20122-JEM (S.D.FLA.)**
**("Mercedes Benz vehicle somehow lost by Plaintiff in a robbery in Mexico")**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ALEXANDER MOSKOVITS,                           CASE NO.: 21-CV-20122-JEM

Plaintiff,

vs.

MERCEDES-BENZ USA, LLC,
AUTONATION, INC., L.P. EVANS MOTORS
WPB, INC. d/b/a MERCEDES-BENZ OF MIAMI,
MAVEL RUIZ, RICHARD IVERS, REX RUSSO,
NANCY GREGOIRE, U.S. DEPARTMENT
OF STATE (DOS), and UNKNOWN AGENTS
(DOES 1 through 10, inclusive),

Defendants.

_____/

### DEFENDANT NANCY GREGOIRE'S MOTION TO DISMISS WITH PREJUDICE

Defendant, NANCY GREGOIRE ("Gregoire"), by and through her undersigned counsel,

moves to dismiss the Complaint with prejudice, and states as follow:

### INTRODUCTION

In this action, Plaintiff, Alexander Moskovits, "(Moskovits" or "Plaintiff") is a dissatisfied,

and defeated, litigant who alleges Defendants, *i.e.,* three private entities, three experienced

lawyers, a respected Florida state court judge, the United States Department of State, in addition

to "Unknown Agents", all worked together to deprive him of his constitutional rights-specifically

a Mercedes Benz vehicle somehow lost by Plaintiff in a robbery in Mexico. One of the attorneys

is Gregoire, who represented Defendants L.P. Evans Motors WPB, Inc. d/b/a Mercedes Benz of

Miami and AutoNation, Inc. (Collectively "AutoNation") in Plaintiff's appeal of multiple orders

entered against him in a now concluded lawsuit Plaintiff filed on May 10, 2018, in the circuit court

**EXHIBIT C**
**E-MAIL CONTAINING FALSE STATEMENTS (DEFAMATION *PER SE*)**

**RE: Only what Pres. Donald Trump calls the corrupt "administrative state" can uphold this decision**

O'Conner, Nicholas <noconner@mcglinchey.com>

Sat 3/11/2023 7:42 AM

To:alexander moskovits <alexander.moskovits@hotmail.com>
Cc:Manning, Matt <mmanning@mcglinchey.com>;Rostron, Teri <trostron@mcglinchey.com>

Mr. Moskovits,

We are aware of your time at Penn. It's my understanding that the activities you participated in and, in fact, facilitated during your time there have a significant impact on the human brain. Had you elected to study at Penn instead of consume what I can only presume was copious amounts of the very drug you peddled, you may still be of sound mind. Unfortunately, from your emails, it is very clear that you are not well.

I hope that you get the help that you desperately need, but even you understand that this is a fruitless endeavor. Your claims are frivolous and your emails are only building up a case that you filed this suit for the purpose of harassment. Had you actually studied at Penn, you may realize what everyone else already knows. It's frankly sad at this point that you are unable or unwilling to come to that obvious realization.

I wish you well.

**From:** alexander moskovits <alexander.moskovits@hotmail.com>
**Date:** Saturday, Mar 11, 2023 at 4:14 AM
**To:** O'Conner, Nicholas <noconner@mcglinchey.com>, Manning, Matt <mmanning@mcglinchey.com>, Rostron, Teri <trostron@mcglinchey.com>
**Subject:** Only what Pres. Donald Trump calls the corrupt "administrative state" can uphold this decision

You may know I attended the Wharton School at UPenn.

President Trump also attended many years before me. I believe at least one of his kids also attended Wharton.

Only what President Trump calls the corrupt "administrative state" or the corrupt "national security state" or the corrupt "deep state" can uphold this decision.

You are deluding yourselves into believing that winning when you are wrong is "success."

Mr. O'Conner (with his medals on the wall during a Zoom hearing) is definitely shameless.

If we ever have a hearing again via Zoom, remind me to plaster on my background wall the photos of the 102 faces of the men women and children my father saved from Nazis like the Frick family who owns Mercedes-Benz.

After reading what I just finished writing so you can churn more fees defending the indefensible, I truly regret not following my father's advice long ago to never to buy a Mercedes because of the Frick family's passionate anti-semitism.

Shame on you. Birds of the same feather fly together.  Keep churning fees and stealing from my daughters and I will make you famous for it.

www.mcglinchey.com | www.CafaLawBlog.com

McGlinchey Stafford, PLLC in Alabama  Florida, Louisiana, Massachusetts, Mississippi, New York, Ohio, Tennessee, Texas, and Washington DC and McGlinchey Stafford, LLP in California.

Confidentiality Statement  This email may contain attorney-client privileged, work product-protected, and/or confidential information. It is for the sole use of the intended recipient(s). If you have received this transmission in error, immediately notify us by telephone at 504-586-1200 and return the original message to us at McGlinchey Stafford  12th Floor, 601 Poydras Street, New Orleans, LA  70130 via the United States Postal Service.

We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission  If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

See McGlinchey Stafford Disclaimer/Privacy Policy https://www.mcglinchey.com/disclaimer.

**EXHIBIT D**
**TRANSCRIPT OF STATUS CONFERENCE HELD BY THE HONORABLE**
**UNITED STATES MAGISTRATE JUDGE DENA PALERMO**
**(JANUARY 19, 2022)**

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\* \* \* \* \*

| | | |
|---|---|---|
| ALEXANDER MOSKOVITS | \* | NO. 4:21-CV-2260 |
| | \* | Houston, Texas |
| Vs. | \* | |
| | \* | |
| MERCEDES BENZ FINANCIAL | \* | 10:34 a.m. - 11:08 a.m. |
| SERVICES USA, LLC, et al | \* | January 19, 2022 |

\* \* \* \* \*

**STATUS CONFERENCE**

BEFORE THE HONORABLE DENA HANOVICE PALERMO
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service.

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1610

```
 1   APPEARANCES:

 2   For Plaintiff:

 3        MR. ALEXANDER MOSKOVITS
          Pro Se
 4        1050 Grand Blvd.
          Deer Park, NY 11729
 5
     For Defendants:
 6
          MR. MATT D. MANNING
 7        MR. NICHOLAS R. O'CONNER
          McGlinchey Stafford, PLLC
 8        1001 McKinney
          Suite 1500
 9        Houston, TX 77002

10   Electronic Recorder:

11        JOSEPH WELLS

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2          **10:34 A.M. – JANUARY 19, 2022**

3               THE COURT:  Good morning.  United States

4    District Court for the Southern District of Texas is

5    now in session.  I'm Judge Palermo presiding.  I call

6    the case of Moskovits vs. Mercedes Benz, 4:21-CV-2260.

7               Can I have appearances, please.

8               MR. MOSKOVITS:  My name is Alexander Moskovits.

9    I'm pro se plaintiff.

10              MR. MANNING:  Your Honor, Matt Manning on

11   behalf of Mercedes Benz, ADESSA, and ARS.

12              MR. O'CONNER:  Your Honor, Nicholas O'Conner

13   also on behalf of Mercedes Benz, ADESSA, and ARS.

14              THE COURT:  All right.  So we're here today

15   for a status conference and I wanted to see where the

16   parties are.  I understand that there are motions

17   pending.  And we've got the Plaintiff's Motion for

18   Leave to File Early Motion for Summary Judgment, and

19   Mercedes' Motion to Dismiss.  And so there's also a

20   motion to strike the affidavit of plaintiff.  And we

21   have, as rebuttal, Automotive Recovery's Motion to

22   Dismiss.  So both defendants have filed Motions to

23   Dismiss and  the plaintiff has responded, and there is

24   also a Motion to Strike.

25              Okay.  So where are we in this case?

4

1   It was recently referred to me, and so I wanted the

2   status conference just to touch base with everybody and

3   see where we are.

4           MR. MOSKOVITS:  Your Honor, I believe my

5   Motion for Early Summary Judgment pursuant to Rule 56

6   is ripe for decision and [U/I] all the pleadings moot,

7   but I will leave it to the Court whether it wants to

8   take that argument.

9           THE COURT:  Okay.  Let me hear from the

10  defendants on their -- I don't need to hear argument on

11  all the motions.  That's not really the purpose of this

12  hearing.  The hearing is really to kind of be more of a

13  status check on where you are and, you know, what needs

14  to come next and what, if any, help you need from the

15  Court.

16          So, have you guys -- and Mr. Manning and

17  Mr. O'Conner, I don't want to cut you off, but I see

18  there are pending motions, basically, that you both

19  have filed Motions to Dismiss.  And just taking a quick

20  look at them, I'm not ready to rule on them at this

21  point.  And then the plaintiff has his Motion for Leave

22  to File an Early Summary Judgment.  I guess, you know,

23  he filed that before you filed the motion to dismiss.

24          Is the case ready for summary judgment?

25  Have you guys done any discovery at this point, or what

1  is the status?

2         MR. MANNING:  No, Your Honor, we haven't

3  engaged in discovery yet and the Motion for Leave to

4  file early summary judgment, again, we treated that as

5  if it were, I guess, in essence an early -- a Motion

6  for Summary Judgment and responded to it.  But it

7  advances the plaintiff's arguments based on the claims

8  that he has in his Amended Complaint.

9         Our Motions to Dismiss are -- and there

10  are three defendants:  Mercedes Benz, ADESSA, and ARS.

11  And there's a little bit of an issue regarding -- there

12  was an issue regarding service.  There's an issue

13  regarding the appropriate parties to be involved.  And

14  that's why we filed the Motion to Dismiss on behalf of

15  ARS.

16         We would ask or believe it's appropriate

17  that the Court rule on certainly the ARS Motion to

18  Dismiss, but also the Motion to Dismiss with respect to

19  Mercedes Benz and ADESSA.  The rationale being that

20  even if -- the standard of 12(b)(6), even if the

21  plaintiff's allegations are taken as true, the

22  arguments set out in the Motion to Dismiss point out

23  why they fail on the pleading.  So before we, you know,

24  get to discovery or any further involvement in the

25  case, we believe that it's appropriate to have a ruling

1   on those, certainly before we engage in discovery.

2          THE COURT:  Okay.  So let me take a quick look

3   at one document that will kind of give me an idea of

4   where you are in the queue.

5          MR. MANNING:  In addition, Your Honor, the

6   parties have engaged in some settlement discussions.

7   Obviously, I don't want to get into those, but that

8   discussion has occurred.

9          THE COURT:  Okay.  And what is the

10  Plaintiff's -- Mr. Moskovits, what are you claiming are

11  your damages here?

12         MR. MOSKOVITS:  Well, Your Honor, it's a

13  denial of judicial process in a case where the Court is

14  adopting the scenario that but for the assistance of

15  law enforcement at the International Border, there

16  would have been no repossession governed by Texas Law

17  or U.S. Constitutional due process principles.  And for

18  example, Texas Business and Commercial Code, Section

19  9.609, which governs the secured third party's right to

20  take possession after default.  In particular, UCC

21  Comment No. 3, which I quote --

22         THE COURT:  Mr. Moskovits, I hate to interrupt

23  you, but your sound is not coming in clearly and I'm

24  only catching about every other word.  So I don't know

25  what you could do to fix that and I don't know if the

1  court reporter is hearing any better than I am.  But,

2  you know, as far as me being able to comprehend what

3  your argument is, I can't do that without hearing

4  better.

5           And I think there is somebody in the

6  background in your -- on your screen, so is there

7  somebody else who needs to make an appearance on the

8  record here?

9           MR. MOSKOVITS:  My daughter.  No, Your Honor.

10           THE COURT:  Okay.  All right.  So can you --

11  you know, maybe you need to get a little closer to the

12  microphone on your computer or turn your speakers up or

13  something so I have a better -- so I can hear you a

14  little bit better.

15           MR. MOSKOVITS:  Well, let me give it another

16  shot.  Your Honor, this is a unique scenario.  I've

17  worked for lawyers for 25 years.  This case presents a

18  scenario that but for the assistance of law enforcement

19  at the International Border, there would have been no

20  repossession governed by Texas law or U.S.

21  Constitutional due process principles.

22           Your Honor, Texas Business and Commercial

23  Code, Section 9.609, governs a secured party's right to

24  take possession after default.  And I respectfully draw

25  your attention to UCC Comment No. 3, which states that

1   this section, meaning 9.609, does not authorize a

2   secured party who repossesses without judicial process

3   to utilize the assistance of law enforcement, a law

4   enforcement officer.  Here, but for the assistance,

5   there would be no repossession.  So there is the clear

6   denial of judicial process, and I believe that

7   constitutes per se unconscionability.

8           THE COURT:  All right, let me ask you a

9   question because I'm not following your argument

10  exactly.  So what -- I'm not following.  What is --

11  what is the law enforcement here?  And let me just --

12  let's back up, you know, a little bit here.  And before

13  we start getting into the fine points of your legal

14  argument, lay out the facts for me.

15          The way I understand it is you bought a

16  car, you drove it to Mexico, you had an accident, you

17  brought it to Mercedes to fix it.  They fixed it, but

18  you had already left Mexico.  And so you wanted them to

19  have it towed back into the United States, which they

20  didn't do, and eventually you were in default on your

21  loan and somebody -- I'm not sure who took the keys --

22  somebody came in and repossessed the car, towed it back

23  to Texas, auctioned it off.

24          Are those the facts?

25          MR. MOSKOVITS:  Right, but used the

1   participation, the integral participation of law

2   enforcement at the International Border --

3            THE COURT:  What was their participation?

4   Tell me what the participation was.

5            MR. MOSKOVITS:  Well, to process the

6   importation of my property into the United States.  And

7   defendants do not deny the local law enforcement in

8   Laredo, Texas, as I allege, quote-unquote, stored the

9   vehicle.  That is a seizure under the Fourth Amendment.

10  Again, my 25 years of experience is in criminal

11  defense.

12            But the holding, the custody of the car

13  by local police in Laredo, Texas also constitutes

14  assistance during this international process.  Part of

15  it was governed by Mexican law while it was south of

16  the border, but at the border and beyond it was

17  governed by Texas law and U.S. Constitutional

18  principles.  And but for law enforcement assistance,

19  there would have been no repossession.  And to do it

20  without judicial process is per se unconscionable.

21            THE COURT:  Okay, give me one second.

22            MR. MOSKOVITS:  They do not deny --

23            THE COURT:  Wait a minute.

24            MR. MOSKOVITS:  -- that the car was held in

25  storage --

1           THE COURT:  Wait a minute, wait a minute.

2           MR. MOSKOVITS:  Thank you.

3           *[Pause]*

4           THE COURT:  Okay.  So what do you know,

5   Mr. Moskovits?  What was the actual process used to

6   repossess the car in Mexico?  The car in Mexico was in

7   the possession of Mercedes; is that correct?

8           MR. MOSKOVITS:  It was in the possession of a

9   Mercedes Benz official dealership, which we had to

10  verify before sending a prepayment of $2,500 from my

11  lawyer's office in New York, Eliza Stahl.  So there was

12  a verification of whether or not this outfit was truly

13  a Mercedes Benz official dealership.  And once that was

14  done, the money was sent.  The car was recovered from

15  there after 13 months of my requesting for it to be

16  towed.  It was towed to the border.  There it

17  necessarily required law enforcement assistance to be

18  processed through an International Border, and then was

19  stored, according to the information obtained from

20  Mercedes Benz Financial Services in June of this year

21  for the first time, that it was stored by Laredo, Texas

22  police.

23           And so from a constitutional perspective,

24  that is custody, that is a seizure.  So, above and

25  beyond the processing at the International Border

1   importing my property into the United States, also the

2   storage which defendants they graciously do not deny at

3   least.  So, based on those facts, there was significant

4   and, in fact, integral -- this is a "but for" scenario.

5            THE COURT:  Okay.

6            MR. MOSKOVITS:  But for --

7            THE COURT:  Okay, okay, okay, I understand.

8   I get it that you are not a lawyer, correct,

9   Mr. Moskovits?

10           MR. MOSKOVITS:  Right.  No, no, I worked --

11           THE COURT:  Worked for lawyers --

12           MR. MOSKOVITS:  -- for lawyers for 25 years.

13  I'm not a lawyer.

14           THE COURT:  Okay.  Okay.

15               So, Mr. Manning, you represent Mercedes.

16  Do you want to just explain to me your theory on this

17  case?  Because I'm having a little bit of issue here.

18           MR. MANNING:  Yes, Your Honor.  The way that

19  the Court set out the facts is pretty concise in the

20  way that we believe that they occurred.  As

21  Mr. Moskovits has already mentioned, the main issue is

22  that this is a Mercedes Benz dealership in Mexico.

23  It's not Mercedes Benz Financial Services, which is who

24  Mr. Moskovits had his loan with and who he sued.  So

25  it's not as if he was conferring or paying Mercedes

 1   Benz Financial Services to do the repairs in Mexico.

 2            When he went into default in -- a number

 3   of years ago, he stopped paying in something like 2019.

 4   And at that point, per the contract between the

 5   parties, Mercedes Benz Financial Services had the

 6   ability to repossess the vehicle, which is what they

 7   did.  He didn't even learn about the repossession until

 8   two years later when he called Mercedes Benz Financial

 9   Services to inquire about the status of the vehicle.

10            So the idea that the repossession,

11   Mercedes Benz transported the vehicle from Mexico to

12   the United States.  And even taking --

13            THE COURT:  Which Mercedes Benz?  Which

14   Mercedes Benz?  Financial Services?

15            MR. MANNING:  Financial Services.

16            THE COURT:  So you transported it -- your

17   company transported it from Mexico to the United States,

18   and at that point it had already been repossessed; is

19   that correct?

20            MR. MANNING:  Essentially, Your Honor, yes.

21   We're arguing that the repossession was concise and

22   complete in Mexico, and that the processing of the

23   vehicle at the border and the storage of the vehicle by

24   police in Laredo were after the fact.  They were after

25   the repossession had concluded.

1           And even so, even if the Court were to

2    find that the repossession was continuing and it was

3    during the time that the vehicle was stored by Laredo

4    Police, a police officer's involvement or law

5    enforcement officer's involvement in doing his job in

6    the context of storing a vehicle, for instance, after

7    it was processed at the border does not constitute a

8    breach of the peace or a violation of due process of

9    the kind that Mr. Moskovits is asserting.  And we make

10   that point in our reply brief to our Motion to Dismiss.

11           THE COURT:  Okay.  Wait, wait, Mr. Moskovits.

12   Let me just have a minute to digest this, okay?

13           Okay.  So what's a little weird to me is --

14   okay, so it's a little weird to me because this is a

15   very unusual set of circumstances, clearly.  Why were

16   the police, if the car was already repossessed and

17   transported across the border, why did the police have

18   to store it?  Why didn't you just take it to another

19   Mercedes dealer?  What does the police storage in

20   Laredo have to do with anything here?

21           MR. MANNING:  Your Honor, I don't know the

22   answer to that yet.  Mr. Moskovits is the one who has

23   indicated that it was stored in Laredo.  We -- I don't

24   know, I haven't been able to verify that fact yet.  But

25   again, as I indicated, even if he's right, it shouldn't

1  matter in the ultimate analysis.

2       THE COURT:  All right.  So, Mr. Moskovits,

3  you agree that under your -- under your contract with

4  Mercedes Benz Financial Services, that once you're in

5  default under the contract, they have the right to

6  repossess it?  Let's pretend that the car was still in

7  Mexico.  Let's pretend the car was in -- where do you

8  live?  Is it Miami?  I can't hear you, Mr. Moskovits.

9       MR. MOSKOVITS:  I would concede, Your Honor,

10  that after 13 months that I did not receive a towing

11  assistance, I took the decision of stopping payment and

12  that I was technically in default.  I concede that.

13           But even if that's true under 9.609,

14  UCC Comment 3, the law enforcement assistance at the

15  International Border, even if there had been no

16  storage by the local Laredo Police, just the integral

17  processing at the border by law enforcement, by

18  Homeland Security and U.S. Customs and so forth,

19  without that, there would have been no repossession,

20  at least none governed by Texas law.  I think it's

21  peculiar that he wants to interpose it, superimpose

22  breach of the peace, which is not something I'm

23  arguing.  I'm not arguing there was a breach of the

24  peace.  And certainly, it's bizarre to try to

25  superimpose Texas law to whatever happened in Mexico.

```
 1              THE COURT:  Yes, but that's what you're,

 2    Mr. Moskovits.

 3              MR. MOSKOVITS:  No, that's what they're

 4    arguing.  My argument is that --

 5              THE COURT:  Wait a second.  Are you saying

 6    that this case is governed by Mexican -- there's only

 7    two laws --

 8              MR. MOSKOVITS:  No, they're arguing that --

 9              THE COURT:  Wait, let me finish.  Wait.  Wait,

10    Mr. Moskovits.

11              MR. MOSKOVITS:  Yes.

12              THE COURT:  When I speak, stop speaking, okay?

13    I know you're not a lawyer, but there are certain rules

14    of decorum in a courtroom and you are -- by Zoom, you

15    are in my courtroom.

16              MR. MOSKOVITS:  Yes.

17              THE COURT:  So, when I speak, you stop

18    speaking, okay?

19              MR. MOSKOVITS:  Very well.

20              THE COURT:  I'm not going to raise my voice.

21    I'm going to tell you now that's just how the rules go

22    for now.

23              MR. MOSKOVITS:  Right.

24              THE COURT:  There's either two laws that

25    apply.  Either Mexico's law applies because the car was
```

1   in Mexico, or Texas law applies because it was towed

2   into Texas, according to your -- according to your

3   complaint.  I don't know whether the defendants agree

4   with that analysis or not.  But according to your

5   statement, it's either Mexico or Texas.  So one of

6   those two laws apply.

7          MR. MOSKOVITS:  Yes.  Only Texas law and U.S.

8   law -- and this is the repossession under U.S. law only

9   starting at the border.  Whatever happened in Mexico is

10  irrelevant, it's extraneous, it's historic --

11         THE COURT:  Well, it's not really extraneous

12  if -- Mr. Moskovits, let me tell you what the flaw in

13  your thinking is based on the arguments that I have

14  heard up until this point.  And obviously, I am going

15  to look at the motions and read the cases and try to

16  figure out what's going on here.

17             But it sounds like to me that the

18  fundamental issue here that you seem to be glossing

19  over is that you were in default on your contract.

20  Once you are in default on the contract, the contract

21  grants the Financial Services company certain rights.

22  Obviously, they are not going to lend money to everyone

23  in the world who wants to buy a Mercedes and then let

24  them default and keep driving around the car.  So they

25  obviously include the right to repossess a car when

1   payments aren't made any more.

2                Your car was in a Mercedes shop, but

3   that's irrelevant to the point of your default.  You

4   had an obligation under the contract to make your

5   monthly payments and you concede you stopped making

6   them.  At some point that triggers a right on the part

7   of the finance company to repossess.  What steps they

8   have to go through to do the repossession is based on

9   what is in your contract.

10               And I haven't looked at the contract.  I

11   don't know whether they have to give you 30 days notice

12   90or if they have to give you 90, or you have to go to

13   court.  You know, you're trying to argue that they

14   should have gone to court to do the repossession

15   because they crossed the border into Texas.  I don't

16   know that any  of that is correct.  I mean, it seems

17   like to me that you were in default and they had a right

18   to repossess the car.  And once you're in default, it's

19   not your car any more.  You're in default.

20          MR. MOSKOVITS:  Even if you are in default,

21   Your Honor, technically, judicial process is required

22   under these circumstances, where but for law

23   enforcement assistance there would have been no

24   repossession governed by Texas law --

25               THE COURT:  Wait, wait, wait.  Are you saying

1   there have been no repossession governed by Texas law?

2   The reason --

3                   MR. MOSKOVITS:   The car wouldn't have -- the

4   car wouldn't reach Texas, Your Honor, if it hadn't been

5   processed by law enforcement at the International

6   Border.

7                   THE COURT:   But the car had already been

8   repossessed in Mexico.

9                   MR. MOSKOVITS:   Then I rest on -- I rest on

10  the papers then, Your Honor.   By the way, my daughter --

11  (audio fades away).

12  .               THE COURT:   I couldn't hear you.

13                  MR. MOSKOVITS:   If I spoke over you, I

14  apologize.

15                  THE COURT:   My daughter is what?

16                  MR. MOSKOVITS:   My daughter told me to tell

17  you I'm diagnosed with a form of autism, and I apologize

18  if I interrupted.

19                  THE COURT:   Okay.

20                  MR. MOSKOVITS:   But, Your Honor, I think I'm

21  going to rest on my papers because my verbal skills

22  seem to be limited.   I'm going to rest on my papers.

23                  THE COURT:   Your verbal skills are excellent

24  and, you know, your papers are actually outstanding for

25  someone who doesn't have a law degree.   So I'm very

1  impressed, Mr. Moskovits.  There are plenty of lawyers

2  who haven't put together papers as legally and as well,

3  you know, argued as your papers are.  I just don't know

4  that you are correct in what you're saying in those

5  papers and I'm going to have to give it a good read.

6  Obviously, all I did was do a quick read in preparation

7  for this hearing so that I could at least know what the

8  case is about.

9            But the thing that troubles me about this

10  case is what I have said.  Your default under the

11  contract gives the company the right to repossess,

12  which it did in Mexico, and then make whatever

13  arrangements it makes, you know, to bring the car

14  wherever it wants to bring it.  And so it's their car

15  at that point.  They've repossessed it.  And if they

16  have repossessed the car based on your default and the

17  car is in Mexico because you brought it to Mexico, then

18  they've repossessed the car and they own it.

19            So their traveling across the border with

20  a car that they owned is no legal infraction.  It is no

21  legal infraction.  So the real question is what does

22  your financing agreement provide?  What kind of notice?

23  What kind of process are they required to go through

24  before they're allowed to repossess your car, and did

25  they follow those rules?

1            If they didn't follow those rules, then

2   maybe you have a breach of contract case against them.

3   But if they did follow, you know, whatever the

4   requirements, whatever the process is that's laid out

5   in the finance agreement, then it seems to me like you

6   lose this case.  Now --

7            MR. MOSKOVITS:  They violated -- they violated

8   UCC Comment 3 to 9.609, clearly.  They utilized the

9   assistance of a law enforcement officer in the process.

10  That's my position and I believe I would prevail in the

11  Fifth Circuit or before the District Court.  But I --

12           THE COURT:  This is the District Court.  You

13  are in District Court.

14           MR. MOSKOVITS:  I'm sorry?

15           THE COURT:  I just wanted to point out to you

16  that you are in the District Court.  I'm a United

17  States Magistrate Judge.  I sit on the United States

18  District Court.

19           MR. MOSKOVITS:  I understand that.  I

20  understand that.  What I meant to say is I believe that

21  my position, which I've studied it very thoroughly, I

22  believe it will ultimately prevail, Your Honor.

23           THE COURT:  Okay.

24           MR. MOSKOVITS:  You know, there's just no way

25  that you can say that there was no law enforcement

1   officer utilized in this process.  And, you know, it

2   just seems -- it just seems clear.

3            THE COURT:  I think you're looking at it too

4   far down the road from when the repossession happened.

5   Unless you're saying that the whole towing of the car

6   was a continuing repossession, I think the repossession

7   happened in Mexico at the point that they take

8   possession of the car from the dealership.  It was --

9            MR. MOSKOVITS:  All that matters -- all that

10  matters is repossession under Texas law and the U.S.

11  Constitution.  What happens south of the border happens

12  south of the border.  What matters and what this

13  Court needs to enforce is American law.  This Court

14  needs to enforce American law.

15           THE COURT:  That's all I know to enforce is

16  American law.  If this is a case that's governed by a

17  Mexican law, then we can figure out what Mexican law is

18  and look at that.  But this is a case that's governed

19  by a contract and we are interpreting the contract.

20  And the question is, what does your contract with the

21  finance company provide in terms of repossession?

22           Mr. Manning, maybe you or Mr. O'Conner,

23  maybe you know the answer to that question.  What was

24  the process that was required for the company to be able

25  to repossess the car?

1              MR. O'CONNER:  Yes, Your Honor.  Yeah, with
2    regard to pre-repossession notice, there was no
3    requirement.  And the retail installment contract is
4    attached to plaintiff's complaint, as well as to a
5    cleaner copy to a Motion to Dismiss, and the Court can
6    review those documents when they consider the motion.
7              There was also a notice, a post-
8    repossession, pre-disposition notice, and that's at
9    issue.  MBFS obviously contends that it sent the
10   notice.  Mr. Moskovits disagrees.  But regardless, Your
11   Honor, whether that notice was sent, Mr. Moskovits'
12   claims are not on breach of contract or under the UCC
13   terms or the DCPA, unconscionability, as well as
14   conversion and civil stat.  So, even if the notice was
15   not sent, Mr. Moskovits cannot prevail on any of those
16   causes of action, which is the basis of our Motion to
17   Dismiss.
18             THE COURT:  Okay.  So the claims that are
19   asserted under the DCPA, and so not. UCC or breach of
20   contract?
21             MR. O'CONNER:  Correct, Your Honor.  There's
22   also a claim for Debt Collection Practices Act.
23   Mr. Moskovits contends that the charge of the
24   transportation and repossession cost and the repairs
25   that MBFSA paid to recover the vehicle from the body

1  shop that plaintiff failed to pay, that charging those

2  to Mr. Moskovits was a violation of the Debt Collection

3  Practices Act.

4         However, as you will also see in the

5  contract, Your Honor, the Retail Installment Contract

6  provides for the recovery of those charges

7  specifically.  And we cite to that section of the

8  Retail Installment Contract.

9         THE COURT:  Okay, got it.

10         All right.  So there are -- there's

11  basically cross-motions against each other because,

12  Mr. Manning and Mr. O'Conner, you have responded to

13  plaintiff's motion for early summary judgment basically

14  on the merits of what he's raising; right?

15         MR. MANNING:  Yes, Your Honor.

16         MR. O'CONNER:  Yes, Your Honor.

17         THE COURT:  Okay.  So what I will do -- what I

18  wanted to do is to look on my list to see where you are

19  and whether -- so there are several cases ahead of your

20  case.  And so I don't anticipate that I'm going to be

21  ruling on the motion for a few months because I have --

22  I have quite a few cases ahead of you, a couple that

23  are pretty time-consuming.

24         And I can understand why you don't want to

25  engage in a bunch of discovery if you think the case is

1  going to be dismissed on the -- you know, dismissed, so

2  why get into a whole bunch of discovery.  Plaintiff has

3  moved for summary judgment, so it seems like to me that

4  you might as well just hold at this point.  Don't

5  engage in any discovery.

6              Is there a Docket Control Order in this

7  case?  I think there is; correct?

8              Yeah, there is a Scheduling Order.  Looks

9  like deadline is February 1st, amending pleadings March

10 1st, and we've got some other deadlines, the filing

11 motion deadline of 6/27.  But plaintiff has already

12 filed for the Motion for Summary Judgment and you've

13 responded to it, and you have your Motion to Dismiss.

14             So what I would suggest is that there be

15 no discovery at this point, meaning that both sides

16 have moved on the papers.  Let me rule on those

17 motions.  And then once we get a ruling, we'll see

18 where we are and then we'll figure out, if we need new

19 dates, what those new dates would be.

20             Okay, does that sound like a good plan?

21        MR. O'CONNER:  Yes, Your Honor.

22        THE COURT:  Mr. Moskovits, is that a good plan

23 for you?

24        MR. MOSKOVITS:  (Audio fades away).

25        THE COURT:  I can't hear you, I can't hear

1  you.  Say it again.  Come closer to your computer.

2          MR. MOSKOVITS:  You know, as long as, you

3  know, my position is whatever is on paper and nothing I

4  said here today should be read as modifying my written

5  position.

6          THE COURT:  No, it's not.  It will not be.  So

7  we will -- I will read the papers, we will go through,

8  you know, all of whatever has been submitted.  And

9  we'll read the papers, we'll look at what's on file,

10 and I will make a ruling.  But like I said, it's going

11 to take me a few months to get to it because there's a

12 long line of cases in front of you.  And I basically do

13 them in the order in which they're ripe.  And so there

14 are too many ahead of you, I'm afraid.

15          But we're working diligently and we will

16 get to it as quickly as possible.  But I don't want you

17 to waste a lot of time and money and energy because,

18 obviously, all of this, Mr. Moskovits, you're pro se,

19 and if the defendants start hammering you with a bunch

20 of discovery, that's going to take up all of your time.

21 And so I don't want you to have to waste your time and,

22 you know, the defendants have to spend a lot of money.

23          But what I would encourage everybody to

24 do in this interim period is to seriously discuss

25 settlement negotiations.  Because, you know, a case

1   like this, if you can resolve it, obviously, you've

2   already briefed things.   But if I rule against

3   everybody and the case is going to keep forward, it's

4   going to be an expense for the defendants.   You're

5   going to have to pay your attorneys.   Your clients will

6   have to pay you, and then there will be, you know,

7   depositions, documents, what have you, and so maybe

8   even a trip to Mexico.

9            So I think that it would be in everyone's

10   best interest at this time to, you know, consider the

11   risk that you have that I may rule against you on the

12   motions that are on file right now and try  to figure

13   out how you can get the case settled, because that

14   would be in everyone's best interest to resolve this

15   case on terms that everyone can live with.   It might

16   not be what anybody wants, but it's something that you

17   can live with, and that would be a good way to get the

18   case resolved.   So that's my suggestion.

19            In the interim, I am going to give you

20   that assignment as homework.   Instead of going on and

21   doing discovery, work on settlement, and keep working

22   on it until you hear a ruling from me.   And hopefully

23   you will tell me that you've settled it so that I don't

24   actually have to rule on the motion.   That would be the

25   best outcome to me.   But I think it would be the best

1   outcome for everyone.  Okay?

2         MR. MANNING:  Yes, Your Honor, we're happy to

3   continue to discuss settlement with Mr. Moskovits.

4   Just like the Court pointed out, his pleadings were in

5   very good shape for a pro se litigant.  He's been very

6   polite and easy to deal with throughout the process.

7   So we're happy to continue to have that discussion and

8   work on it.

9         THE COURT:  Okay, great.  I'm telling you, we

10  have a lot of pro se stuff and you did a great job.  I

11  mean, that's right there a pretty good statement.

12            So, okay, y'all have a good day.  I will

13  be back in touch with you.  I will not set this for

14  another hearing unless I want to make a ruling and I

15  need some kind of clarification from the parties.  But

16  in the event that you settle the case, please let us

17  know right away; okay?

18        MR. MANNING:  We will, Your Honor.

19        MR. O'CONNER:  Thank you, Your Honor.

20        MR. MOSKOVITS:  Thank you.  Thank you for your

21  time, Your Honor.

22        THE COURT:  Y'all have a good day.

23        MR. MOSKOVITS:  Thank you, Mr. Manning.  And

24  thank you, Mr. O'Conner.

25        *[11:08 a.m. - Proceedings adjourned]*

C E R T I F I C A T I O N

    I certify that the foregoing is a correct transcript of the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Gwen Reed

1-27-23